346 F.3d 1368
 ALLEGHENY LUDLUM CORP., AK Steel Corp., Butler Armco Independent Union, J&L Specialty Steel, Inc., United Steelworkers of America, AFL-CIO/CLC, and Zanesville Armco Independent Organization, Plaintiffs-Appellants,
v.
UNITED STATES, Defendant-Appellee.
 No. 03-1096.
 United States Court of Appeals, Federal Circuit.
 DECIDED: October 15, 2003.
 
 Jeffrey S. Beckington, Collier Shannon Scott, PLLC, of Washington, DC, argued for plaintiffs-appellants. With him on the brief were David A. Hartquist and Adam H. Gordon.
 Stephen C. Tosini, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were David M. Cohen, Director; and Lucius B. Lau, Assistant Director. Of counsel were Scott D. McBride, Berniece A. Browne, and John D. McInerney, Attorneys, United States Department of Commerce, of Washington, DC.
 Before MICHEL, LOURIE, and DYK, Circuit Judges.
 MICHEL, Circuit Judge.
 
 
 1
 Allegheny Ludlum Corp. et al. (collectively, "Allegheny") appeal from a decision of the United States Court of International Trade dismissing their case and upholding the United States Department of Commerce's ("Commerce's") rescission of the first administrative review of its antidumping order against stainless steel plate in coils ("SSPC") from Taiwan. Allegheny Ludlum Corp. v. United States, 240 F.Supp.2d 1262 (Ct. Int'l Trade 2002). Because we agree with the Court of International Trade's holdings that Commerce's policy in determining when to rescind an administrative review is lawful and that Commerce's application of that policy in this case was reasonable and in accordance with law, we affirm.
 
 BACKGROUND
 
 2
 On March 31, 1999, Commerce issued an antidumping order and assigned dumping margins (and cash deposit rates) on SSPC exported to the United States by Yieh United Steel Corporation ("YUSCO") and its "middleman," Ta Chen Stainless Pipe Co., Ltd. ("Ta Chen") (and its wholly owned U.S. subsidiary, Ta Chen International Corp.). In 2000, Commerce initiated an administrative review, at the behest of YUSCO and Allegheny, of YUSCO's and Ta Chen's SSPC activities for a given period ("the period of review").[1] In response to Commerce's inquiries YUSCO and Ta Chen both claimed they had not exported any SSPC to the United States during the period of review; rather, any SSPC that had been sold during that period had entered the United States prior to the start of the period of review.
 
 
 3
 Subsequent to those statements, Commerce reviewed Customs' databases and found that they showed no entries of SSPC from YUSCO or Ta Chen during the period of review. Commerce also reviewed Customs' documentation of a large, random sample of Ta Chen's and YUSCO's entries during the period of review and found that none of them was of SSPC. Commerce then rescinded its administrative review pursuant to 19 C.F.R. § 351.213(d),[2] because it determined that there had been no entries of SSPC during the period of review, and because of its policy that sales of merchandise that can be demonstrably linked with entries prior to the suspension of liquidation are not "subject merchandise" under 19 U.S.C. § 1677(25) and are therefore not subject to review. Stainless Steel Plate in Coils From Taiwan: Final Rescission of Antidumping Duty Administrative Review, 66 Fed. Reg. 18,610 (Apr. 10, 2001) ("Final Rescission").
 
 
 4
 Allegheny contested Commerce's rescission of the administrative review in the Court of International Trade. The trial court upheld Commerce's policy of considering sales linked with pre-period-of-review entries as not subject merchandise because it "results in a more accurate administration of the antidumping statute because it properly excludes irrelevant sales from the dumping determination." Allegheny, 240 F.Supp.2d at 1266 (citing STC Corp. v. United States, 990 F.Supp. 829, 832 n. 2 (Ct. Int'l Trade 1997)). The trial court determined that "Commerce's regulations are not contrary to law" because the agency had properly applied the statutory requirement to analyze "data for imports into the United States for a discrete period of time." Id. The trial court also rejected Allegheny's argument that Commerce erred by not forcing Ta Chen to document that its sales of SSPC during the period of review were linked to earlier entries. Id. at 1267.
 
 
 5
 Allegheny filed a timely notice of appeal to this court. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5) (2000).
 
 DISCUSSION
 
 6
 * Allegheny argues that Commerce's policy of not conducting administrative reviews of sales linked with pre-period-of-review entries is not in accordance with law. Specifically, Allegheny argues that by not conducting administrative reviews when there are sales but no customs entries, Commerce contravenes congressional intent that middleman dumping be examined and that cash deposit rates be calculated as accurately and currently as possible.
 
 A.
 
 7
 19 U.S.C. § 1675(a)(2)(A) provides for annual review of antidumping duties with respect to entries: "the administering authority shall determine — (i) the normal value and export price (or constructed export price) of each entry of the subject merchandise, and (ii) the dumping margin for each such entry." (Emphases added).
 
 
 8
 Notwithstanding the plain language of the statute, Allegheny argues that Congress intended examination of middleman dumping using sales rather than entries. As support, Allegheny recites the following legislative history:
 
 
 9
 Regulations should be issued, consistent with present practice, under which sales from the foreign producer to middlemen and any sales between middlemen before sale to the first unrelated U.S. purchaser are examined to avoid below cost sales by middlemen.
 
 
 10
 Trade Agreements Act of 1979, S.Rep. No. 96-249, at 75, 1979 U.S.C.C.A.N. 381, 480 (1979). The cited legislative history supports the proposition that non-affiliated middlemen are to be examined by Commerce. We do not, however, think congressional intent requires Commerce to continue an annual review in cases such as this.
 
 
 11
 Allegheny does not demonstrate that Commerce's policy, based on its regulations, of not reviewing an antidumping order where no new entries have occurred contravenes Congress' intent that middleman sales be reviewed. It is true that in this case, the middleman sales based upon the pre-period-of-review entries were not reviewed and the cash deposit rates were not updated. But this does not mean that Commerce's policy and regulations contravene congressional intent — indeed, Commerce originally investigated Ta Chen's middleman sales and imposed an antidumping order and cash deposit rates on Ta Chen's sales. Commerce's policy relates only to its method of conducting annual reviews of antidumping orders — where sales can be linked to customs entries, it is only entries within the period of review that are examined and used to calculate the cash deposit rates. Preamble to Antidumping Duties; Countervailing Duties; Final Rule, 62 Fed. Reg. 27,296, 27,314 (May 19, 1997) ("Merchandise that entered the United States prior to the suspension of liquidation [i.e., the beginning of the period of review] (and in the absence of an affirmative critical circumstances finding) is not subject merchandise within the meaning of [19 U.S.C. § 1677(25)]."); Certain Stainless Wire Rods From France: Final Results of Antidumping Duty Administrative Review ("French Wire Rod"), 61 Fed. Reg. 47,874, 47,875 (Sept. 11, 1996) (stating that "[s]ales of merchandise that can be demonstrably linked with entries prior to the suspension of liquidation are not subject merchandise and therefore are not subject to review by the Department"); cf. Hynix Semiconductor, Inc. v. United States, 248 F.Supp.2d 1297, 1304 (Ct. Int'l Trade 2003) (approving of Commerce's examination of sales of semiconductors during the period of review where entries could not be tied to sales, based upon the "importance of consistency across reviews"). Indeed, as stated by the Court of International Trade in Hynix, "nothing in Commerce's regulations supports the use of a hybrid sales plus [entries] approach for calculating dumping margins." 248 F.Supp.2d at 1304.
 
 
 12
 In short, Commerce's policy has nothing to do with whether or not it scrutinizes middleman sales, but only with its methodology for reviewing all antidumping duty orders. Where, as here, Commerce has imposed an antidumping duty order based on entries, Commerce's practice of conducting an administrative review of that order is to look at entries rather than sales where those sales can be linked to entries. Commerce's policy, then, does not conflict with congressional intent and merely implements its lawful regulations. See 19 C.F.R. § 351.213(e)(1)(ii) ("For requests received ... an administrative review will cover, as appropriate, entries, exports, or sales during the [period of review].") (emphasis added); id. § 351.213(d)(3) ("[Commerce] may rescind an administrative review... if the Secretary concludes that during the period covered by the review, there were no entries, exports, or sales of the subject merchandise, as the case may be.") (emphasis added).
 
 B.
 
 13
 Allegheny also argues that Commerce's regulatory policy contravenes congressional intent that cash deposit rates be calculated as accurately and currently as possible. Allegheny cites two primary sources for such congressional intent. First, Allegheny notes that 19 U.S.C. § 1675(a)(1)-(2) call for annual administrative reviews to update dumping margins. Second, Allegheny recites the following legislative history:
 
 
 14
 The second major change is the requirement that merchandise subject to an antidumping order may be entered only upon the deposit of estimated antidumping duties. Under the present practice such merchandise may enter under bond. The committee feels strongly that this practice does not sufficiently deter dumping. Rather, it provides an incentive to exporters and importers to delay in submitting information necessary to form the basis of an assessment. The Committee believes that the requirement of cash deposits will ensure that complete information will be submitted to the Authority in a timely manner.
 
 
 15
 Trade Agreements Act of 1979, H.R.Rep. No. 96-317, at 69 (1979).
 
 
 16
 Allegheny's argument here fails for reasons similar to those above. First, the statutory commands that an annual administrative review "shall" take place where requested, 19 U.S.C. § 1675(a)(1), and that the review "shall be the basis for ... deposits of estimated duties," id. § 1675(a)(2)(C), do not preclude Commerce's policy here. The statutes indicate that where requested, Commerce must initiate a review. However, the statutes say nothing about how Commerce is to conduct that review — which is all that is at issue here. In conducting annual reviews of the cash deposit rates Commerce ignores sales that occur during the period of review where they can be linked to pre-period entries; where the sales cannot be linked, it may look to sales or exports "as appropriate" in any individual case. 19 C.F.R. § 351.213(e)(1)(ii). It follows that where there are no entries or unlinked sales during a period of review there is no subject merchandise and thus nothing to review and no basis for revising cash deposit rates — so Commerce need not (indeed, cannot) conduct a review.
 
 
 17
 Second, although Allegheny shows that there is a clear congressional intent that cash deposit rates be as accurate and current as possible, Allegheny does not establish that setting a new cash deposit rate based on sales where the initial rate was based upon entries would be more accurate. Indeed, the Court of International Trade concluded that cash deposit rates actually are more accurate under Commerce's methodology, because the basis for the rates (i.e., sales, entries, or exports) remains consistent throughout the original investigation and subsequent reviews. Allegheny, 240 F.Supp.2d at 1266 (citing STC Corp., 990 F.Supp. at 832 n. 2). In short, we discern a congressional intent that cash deposit rates be accurate and current; we see no congressional intent indicating how Commerce should accomplish that goal.
 
 
 18
 In sum, because we must reject all of Allegheny's arguments to the contrary, we hold lawful Commerce's regulatory policy of rescinding annual administrative reviews where there are no entries during the period of review and where all in-period sales can be linked to pre-period-of-review entries.
 
 II
 
 19
 Allegheny's alternative argument is that Commerce's application of its policy in this case was "unjustifiable." Allegheny asserts that "[b]y assuming the burden of Ta Chen to link Ta Chen's middleman U.S. resales of YUSCO's SSPC to pre-suspension entries, Commerce departed from its prior practice without a valid reason for its departure." Once again, we must reject Allegheny's argument as unsupportable.
 
 
 20
 Allegheny is correct that Commerce has an established practice of placing the burden on the respondent in the administrative review to "demonstrate, to the satisfaction of the Department, the linkage between the entry and the sale." French Wire Rod, 61 Fed. Reg. at 47,877-78. As the trial court noted, however, this is not a burden imposed by statute or regulation — it is merely a general practice of Commerce. Allegheny, 240 F.Supp.2d at 1267. Thus, Commerce is permitted to deviate from this past practice, at least where it explains the reason for its departure. See Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade, 412 U.S. 800, 808, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1973) ("[The agency] may find that, although the rule in general serves useful purposes, peculiarities of the case before it suggest that the rule not be applied in that case. Whatever the ground for the departure from prior norms, however, it must be clearly set forth so that the reviewing court may understand the basis of the agency's action and so may judge the consistency of that action with the agency's mandate.").
 
 
 21
 Commerce based its departure here on Ta Chen's statements that all of its sales were linked to pre-period-of-review entries and Commerce's own look at Customs' databases and a random sampling of the documentation corresponding to the entries. Thus, while Ta Chen could have provided information that would not be entirely redundant to information Commerce had obtained (i.e., on sales or entries not a part of the random sample Commerce examined), Commerce here deemed the additional documentation unnecessary. Preliminary Rescission of Antidumping Duty Administrative Review: Stainless Steel Plate in Coils From Taiwan, 65 Fed. Reg. 75,670, 75,671 (Dec. 4, 2000) ("[T]he Department's Customs inquiry indicates that such merchandise did not enter the United States after the suspension of liquidation."); see also Final Rescission, 66 Fed.Reg. at 18,610. We conclude that in this case Commerce adequately explained and justified its deviation from its ordinary practice of requiring the respondent to provide such information because it determined that additional information linking sales and entries would merely be cumulative in view of information already before the agency.
 
 CONCLUSION
 
 22
 In conclusion, we hold lawful (1) Commerce's regulatory policy of rescinding annual reviews and hence not updating cash deposit rates where there are no entries during the period of review and where all period-of-review sales can be linked to pre-period-of-review entries, and (2) Commerce's deviation under the particular circumstances here from its normal practice of requiring the respondent in an administrative review to produce documents demonstrating, to the satisfaction of the Department, the linkage between each such entry and the sale. Therefore, the judgment of the Court of International Trade is
 
 
 23
 
 AFFIRMED.
 
 
 
 
 Notes:
 
 
 [1]
 YUSCO later (July 19, 2000) asked for rescission of the review because none of its subject merchandise entered the United States during the period of review
 
 
 [2]
 "[Commerce] may rescind an administrative review ... if the Secretary concludes that during the period covered by the review, there were no entries, exports, or sales of the subject merchandise, as the case may be." 19 C.F.R. § 351.213(d) (2002)