# United States Court of Appeals for the Federal Circuit

---

**MICHAELS STORES, INC.,**
*Plaintiff-Appellant,*

v.

**UNITED STATES,**
*Defendant-Appellee.*

---

2014-1051

---

Appeal from the United States Court of International Trade in No. 12-CV-00146, Judge Jane A. Restani.

---

Decided: September 10, 2014

---

MATTHEW R. NICELY, Hughes Hubbard & Reed LLP, of Washington, DC, argued for plaintiff-appellant. With him on the brief were LYNN G. KAMARCK and ALEXANDRA B. HESS.

STEPHEN C. TOSINI, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were STUART F. DELERY, Assistant Attorney General, JEANNE E. DAVIDSON, Director, and PATRICIA M. MCCARTHY, Assistant Director. Of counsel on the brief was DANIEL J. CALHOUN, Senior Attorney, Office of the Chief Counsel for Trade Enforce-

ment and Compliance, United States Department of Commerce, of Washington, DC.

_____

Before PROST, *Chief Judge*, CLEVENGER and CHEN, *Circuit Judges.*

PROST, *Chief Judge*.

American arts and crafts supply retailer Michaels Stores, Inc. ("Michaels") appeals from the decision of the United States Court of International Trade affirming the Department of Commerce's ("Commerce") antidumping rates assigned to certain cased pencils manufactured and exported by businesses in the People's Republic of China ("PRC"). Commerce assigned Michaels' exporters a country-wide antidumping cash deposit rate, as opposed to lower rates obtained by the pencils' producers. Michaels argues it is entitled to the producer rate based on its reading of 19 C.F.R. § 351.107(b)(2), which states that "if the Secretary has not established previously a combination cash deposit rate . . . for the exporter and producer in question or a noncombination rate for the exporter in question, the Secretary will apply the cash deposit rate established for the producer." Because § 351.107(b)(2) is informed by § 351.107(d), which establishes an initial noncombination rate for all producers and exporters in nonmarket economy countries, we affirm.

## BACKGROUND

Commerce has the general authority within certain parameters to set the cash deposit rates associated with imported goods in an effort to curb "dumping," i.e., exporting goods far below typical market prices in order to lower the profits of domestic competitors. 19 U.S.C. § 1673e(a)(3). Upon a finding of material injury to a U.S. industry, Commerce sets antidumping rates for the producers and exporters of foreign goods, and it may also assign special rates for specific American importers.

Rates that apply to specific combinations of producers, exporters, and/or importers are referred to as "combination" rates. *See* 19 C.F.R. § 351.107(b)(1)(i). A noncombination rate, in contrast, is a rate that applies to a producer or exporter and is not combined with the rate of another entity. *See id.*

Commerce distinguishes between traditional market economies, where money is exchanged for goods and services, and "nonmarket economies" (NMEs), such as barter systems or state-controlled economies. *See Final Determination of Sales at Less Than Fair Value: Sparklers From the People's Republic of China*, 56 Fed. Reg. 20,588 (May 6, 1991) ("*Sparklers*"). The PRC has been classified as an NME country since as early as 1987. *Tapered Roller Bearings From the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 52 Fed. Reg. 19,7481 (May 27, 1987); *see also Certain Cased Pencils from China: Preliminary Results,* 76 Fed. Reg. 2337, 2338–39 (Jan. 13, 2011).

In NME proceedings, Commerce begins with a rebuttable presumption that a company operating within a NME is subject to state control. *See id*; *accord Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 75 Fed. Reg. 4770, 4771 (Jan. 29, 2010). Commerce therefore applies a single country-wide antidumping deposit rate to *all* NME producers and exporters, unless the producer, exporter, or another interested party can prove through an administrative review process (established by 19 C.F.R. § 351.213(b)) that the exporter or producer at issue is not subject to government control and thus eligible for a lower rate. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 75 Fed. Reg. at 4771; *Policy Bulletin* 05.1 at 4 (Dep't of Commerce Apr. 5 2005), *available at* http://enforcement.trade.gov/policy/bull05-1.pdf.

In 1994, the International Trade Commission conducted an investigation in which it found that a U.S. industry was threatened with material injury by reason of imports of certain cased pencils from the PRC. *See Antidumping Duty Order: Certain Cased Pencils from the People's Republic of China*, 59 Fed. Reg. 66,909 (Dec. 28, 1994). Commerce accordingly imposed antidumping duties and later initiated administrative reviews for the 2008-2009 and 2009-2010 time periods, which are at issue here.

During the 2008-2009 period of administrative review, Michaels imported cased pencils that were manufactured by three producers in the PRC: China First Pencil Co., Ltd. ("China First"), Shanghai Three Star Stationery Industry Co., Ltd. ("Three Star"), and Shandong Rongxin Import and Export Co., Ltd. ("Rongxin"). *Michaels Stores, Inc. v. United States*, 931 F. Supp. 2d 1308, 1309 (Ct. Int'l Trade 2013). These producers did not sell to Michaels directly; rather, Michaels obtained the pencils through three different PRC exporters: DGI LLC, Ningbo Jinchao Plastic Products Co., Ltd., and Shanghai Changyang Industry Co. Ltd.

The pencil producers all participated in Commerce's 2008-2009 administrative review process; however, China First and Three Star withdrew their requests for review, *Certain Cased Pencils from China: Preliminary Results,* 76 Fed. Reg. at 2,338, and Rongxin's review did not include pencils exported to Michaels. *Certain Cased Pencils from China: Final Results*, 76 Fed. Reg. 27,988, 27,989 (May 13, 2011) ("Rongxin did not report entered values for its U.S. sales."). During the 2009-2010 period of review, Rongxin initiated a review, but China First and Three Star did not. *Michaels,* 931 F. Supp. 2d at 1311. None of the Chinese firms responsible for exporting the pencils to Michaels participated in either administrative review process. *Id.* at 1317.

Michaels claims, and Commerce apparently does not dispute, that the producers' rates were eventually established for the two administrative review periods as 26.32 and 10.41% for China First-manufactured pencils, 2.66% for Three Star-manufactured pencils (for both periods), and 11.48 and 3.55% for Rongxin-manufactured pencils. Nonetheless, it is also undisputed that none of the exporters selling the pencils to Michaels qualified for a separate rate at any time during the periods of review at issue. *Id.*

Upon importing the pencils into the United States, Michaels made its cash deposit to U.S. Customs and Border Protection ("Customs") based on the cash rates then in place for the pencils' producers. *Id.* at 1310. Customs responded by issuing additional bills to Michaels charging a PRC-wide rate of 114.90% *ad valorem* for both administrative review periods. *Id.* Michaels brought an action under 28 U.S.C. § 1581 to challenge the rates used by Customs. *Id.*[1] The Court of International Trade upheld Customs' liquidation rates, and Michaels appeals. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).

STANDARD OF REVIEW

We review decisions of the Court of International Trade without deference, applying the same substantial evidence standard of review that the court itself applies in reviewing Commerce's determinations. *Atar S.R.L. v. United States*, 730 F.3d 1320, 1325 (Fed. Cir. 2013). In addition, we give substantial deference to an agency's interpretations of its own regulations, unless they are

---

[1]   A parallel proceeding is currently pending in the Court of International Trade, *Michaels Stores, Inc. v. United States*, No. 12-00145, in which Michaels has separately challenged the manner in which Customs implemented the liquidation instructions issued by Commerce.

plainly erroneous or inconsistent with the regulations. *Torrington Co. v. United States*, 156 F.3d 1361, 1364 (Fed. Cir. 1998) (citing *Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 512 (1994)).

## DISCUSSION

This appeal hinges on two subsections of 19 C.F.R. § 351.107: subsection (b)(2) and subsection (d). Michaels argues that it is entitled to use its producers' rates under § 351.107(b)(2), which states:

> In the case of subject merchandise that is exported to the United States by a company that is not the producer of the merchandise, if the Secretary has not established previously a combination cash deposit rate under paragraph (b)(1)(i) of this section for the exporter and producer in question or a noncombination rate for the exporter in question, the Secretary will apply the cash deposit rate established for the producer.

Michaels asserts that, because no previous combination or noncombination rate was established for its exporters, the Secretary was required under subsection (b)(2) to apply the cash deposit rates established for the pencils' producers instead. Meanwhile, the United States relies on subsection (d) of the same regulation, which provides that "in an antidumping proceeding involving imports from a nonmarket economy country, 'rates' may consist of a single dumping margin applicable to all exporters and producers." § 351.107(d).

Michaels claims that subsection (b)(2) is unambiguous and controls the outcome of this case, and even goes so far as to argue that "subsection (d) is irrelevant to the question posed in this appeal." Appellant's Reply Br. 7.

We disagree. Given the language of subsection (d) and its applicability to both exporters and producers in NME countries, this provision is indeed relevant to an

antidumping proceeding such as this one.[2]  The discrepancy between the parties stems from an inherent ambiguity in § 351.107, specifically whether the "noncombination rate" referred to in subsection (b)(2) includes the NME-wide rate established by subsection (d).  Keeping in mind that we give substantial deference to Commerce's interpretations of its own regulations unless they are plainly erroneous or inconsistent with the regulation, *see Torrington Co.*, 156 F.3d at 1364, we turn now to the proper interpretation of the regulation.

In crafting § 351.107, Commerce designed a hierarchy in which the exporter rate is to be used, if it exists, prior to the producer's rate.  This preference for the exporter rate over the producer rate is reflected both in the structure of subsection (b)(2) as well as in preamble language published in the Federal Register.  *See Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,305 (May 19, 1997) ("[W]e intend to continue calculating [antidumping] rates for NME export trading companies, and not the manufacturers supplying the trading compa-

---

[2]   When pressed at oral argument to reconcile the two subsections, Michaels maintained that subsection (d) could be read to allow Commerce to adopt a single rate for *all* exporters and producers within a NME country, but that the subsection would not apply unless *every* exporter and producer within a country were assigned the same rate.  *See* Oral Arg. 10:54–11:50, *available at* http://www.cafc.uscourts.gov/oral-argument-recordings/2014-1051/all.  This interpretation is inconsistent with Commerce's longstanding practice of assigning separate rates to companies within an NME country that can demonstrate independence from state control.  *Policy Bulletin* 05.1 at 4 (Dep't of Commerce Apr. 5 2005), *available at* http://enforcement.trade.gov/policy/bull05-1.pdf.

nies."). Commerce recognized that, compared to manufacturers, exporters are more likely to control prices for goods and are more likely to know which goods are destined for the United States. *See Michaels*, 931 F. Supp. 2d at 1318. Commerce was also concerned that a producer not subject to state control might nonetheless use a state-controlled exporter in order to dump their goods in the United States. *Id.*

Indeed, it has been Commerce's policy since 1991 to apply a country-wide rate to all exporters doing business in the PRC unless the *exporter* (not the manufacturer) establishes *de jure* and *de facto* independence from state control in an administrative review proceeding. *Sparklers*, 56 Fed. Reg. at 20,589. This court has endorsed this presumption on multiple occasions. *See, e.g., Transcom, Inc. v. United States*, 294 F.3d 1371, 1373 (Fed. Cir. 2002); *Sigma Corp. v. United States*, 117 F.3d 1401, 1405-06 (Fed. Cir. 1997).

We agree with the Court of International Trade that subsection (d) sheds light on the meaning of subsection (b)(2) when the provisions are read in conjunction. *See Michaels*, 931 F. Supp. 2d at 1316. Specifically, subsection (d) establishes a default country-wide rate for all NME exporters and producers; this rate also serves as the "noncombination rate" referred to in subsection (b)(2). Michaels has not demonstrated that Commerce's interpretations of the regulation in practice are plainly erroneous or inconsistent with the regulation. Because a noncombination rate for the exporter was established as the PRC-wide rate of 114.90%, Michaels could not rely on its producer rates as a substitute. Were we to conclude otherwise, Michaels could circumvent its antidumping obligations by buying pencils from a state-controlled exporter at a discounted price and then use the antidumping rate associated with its non-state controlled manufacturer.

Michaels raises two additional arguments on appeal. First, Michaels argues that by changing its procedures without allowing for notice and comment, Commerce failed to comply with the Administrative Procedure Act (APA). However, Michaels conceded at oral argument that if this court agrees that Commerce correctly interpreted § 51.107, as we have done, then we need not address its argument under the APA. Oral Arg. 6:20.

Michaels also argues that Commerce's interpretation of the regulation is "unfair to importers such as Michaels who appropriately relied on the plain language of the applicable regulation in assessing its antidumping liability." Appellant's Reply Br. 13. However, as discussed above, Commerce has utilized a default country-wide rate for NME exporters for decades. Neither the pencils' producers nor Michaels itself initiated an administrative review on the exporters' behalf, even though either could have qualified as an "interested party" for the purposes of 19 C.F.R. § 351.213(b). *See* 19 U.S.C. § 1677(9)(A) ("The term 'interested party' means . . . a foreign manufacturer, producer, or exporter, or the United States importer, of subject merchandise . . . ."). Michaels had ample notice of Commerce's long-standing procedures and the opportunity to seek a separate exporter rate. Thus, we are not persuaded by Michaels' unfairness argument.

## CONCLUSION

For the aforementioned reasons, we affirm the judgment of the Court of International Trade.

## **AFFIRMED**