# United States Court of Appeals for the Federal Circuit

_____

**DIAMOND SAWBLADES MANUFACTURERS COALITION,**
*Plaintiff-Appellee*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

**v.**

**BEIJING GANG YAN DIAMOND PRODUCTS COMPANY, GANG YAN DIAMOND PRODUCTS, INC.,**
*Defendants-Appellants*

**CLIFF INTERNATIONAL, LTD.,**
*Defendant*

_____

2016-1253

_____

Appeal from the United States Court of International Trade in No. 1:13-cv-00078-RKM, Senior Judge R. Kenton Musgrave.

_____

Decided:  August 7, 2017

_____

DANIEL B. PICKARD, Wiley Rein, LLP, Washington, DC, argued for plaintiff-appellee. Also represented by USHA NEELAKANTAN, MAUREEN E. THORSON.

JOHN JACOB TODOR, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by BENJAMIN C. MIZER, JEANNE E. DAVIDSON, FRANKLIN E. WHITE, JR.; AMANDA T. LEE, Office of Chief Counsel for Trade Enforcement and Compliance, United States Department of Commerce, Washington, DC.

JEFFREY S. NEELEY, Husch Blackwell LLP, Washington, DC, argued for defendants-appellants. Also represented by MICHAEL SCOTT HOLTON.

DANIEL L. PORTER, Curtis, Mallet-Prevost, Colt & Mosle LLP, Washington, DC, for amici curiae Shanghai Huayi Group Corporation Limited, China Manufacturers Alliance. Also represented by JAMES P. DURLING, CLAUDIA DENISE HARTLEBEN; GENE C. SCHAERR, Schaerr Duncan, Washington, DC.

WILLIAM ALFRED FENNELL, Stewart & Stewart, Washington, DC, for amici curiae United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO-CLC, Titan Tire Corporation. Also represented by NICHOLAS J. BIRCH, LANE S. HUREWITZ, TERENCE PATRICK STEWART.

_____

Before LOURIE, O'MALLEY, and TARANTO, *Circuit Judges.*

O'Malley, *Circuit Judge.*

The Advanced Technology & Materials entity ("ATM"), comprised of Beijing Gang Yan Diamond Products Company, Gang Yan Diamond Products, Inc., and

other affiliated companies, appeals from a decision of the Court of International Trade ("CIT") upholding the Department of Commerce's ("Commerce") determination in a first administrative review of an earlier-imposed antidumping order. [1]  In that review, Commerce imposed an adjusted PRC-wide entity rate of 82.12% on subject goods imported by ATM.  *See Diamond Sawblades Mfrs. Coal. v. United States* (*CIT Decision*), 2015 Ct. Int'l Trade LEXIS 107 (Ct. Int'l Trade Sept. 23, 2015).  Because the CIT did not err in upholding Commerce's decision, we affirm.

## I. BACKGROUND

### A.  Basis for Investigations and Administrative Reviews

Pursuant to 19 U.S.C. § 1673, Commerce imposes an antidumping duty on foreign merchandise if: (1) it determines that the merchandise "is being, or is likely to be, sold in the United States at less than its fair value," and (2) the International Trade Commission ("ITC") determines that the sale of the merchandise at less than fair value materially injures, threatens, or impedes the establishment of an industry in the United States.  If an interested party files a petition with Commerce on behalf of an industry alleging that foreign merchandise warrants the

---

[1]  This appeal is related to the appeal in *Diamond Sawblades Manufacturers Coalition v. United States* (*Diamond Sawblades II*), Case Nos. 2016-1254, -1255, also decided today.  Both opinions involve administrative reviews of the antidumping duty order Commerce issued after its investigation into the potential dumping of diamond sawblades and parts thereof from the People's Republic of China ("PRC").  This opinion addresses Commerce's first administrative review of the antidumping duty rate, covering the period 2009–2010, and the opinion in *Diamond Sawblades II* addresses the second administrative review, covering the period 2010–2011.

imposition of an antidumping duty under § 1673, Commerce initiates an antidumping duty investigation. 19 U.S.C. § 1673a. As part of this investigation, Commerce calculates a "normal value" for the subject merchandise—the price at which the "foreign like product" is sold in the exporting country or in a representative country if, *inter alia*, the exporting country has a market situation that does not permit a proper comparison—so that it can compare the export price of the foreign merchandise with the normal value. *Id.* § 1677b.

If Commerce and the ITC conclude that the imports or sales of the subject merchandise are governed by § 1673, Commerce issues an antidumping duty order. *Id.* § 1673d(c)(2). The amount of the antidumping duty is "the amount by which the normal value exceeds the export price (or the constructed export price) for the merchandise." *Id.* § 1673. If requested, Commerce conducts a yearly administrative review of the antidumping duty order and calculates a new antidumping duty rate. *Id.* § 1675(a)(1)–(2).

B. Commerce's Investigation into Diamond Sawblades

On May 3, 2005, Diamond Sawblades Manufacturers Coalition ("DSMC") filed a petition on behalf of the domestic industry and workers producing diamond sawblades regarding imports of diamond sawblades. *Preliminary Determination of Sales at Less than Fair Value, Postponement of Final Determination, and Preliminary Partial Determination of Critical Circumstances: Diamond Sawblades and Parts Thereof from the People's Republic of China* (*Investigation Preliminary Determination*), 70 Fed. Reg. 77,121, 77,121 (Dep't of Commerce Dec. 29, 2005). In response to the petition, Commerce initiated an investigation on June 21, 2005. *Id.* In its final determination, Commerce found that diamond sawblades from the PRC were being, or were likely to be, sold in the United States at less than fair value. *Final Determina-*

*tion of Sales at Less Than Fair Value and Final Partial Affirmative Determination of Critical Circumstances: Diamond Sawblades and Parts Thereof from the People's Republic of China* (*Investigation Final Determination*), 71 Fed. Reg. 29,303, 29,303 (Dep't of Commerce May 22, 2006). The ITC separately found that the importation of diamond sawblades from the PRC threatened a United States industry with material injury. *See Diamond Sawblades and Parts Thereof from China*, Inv. No. 731-TA-1092, USITC Pub. 4559, 2015 ITC LEXIS 1140, at *3–4 (Sept. 1, 2015) (Review).

In the *Investigation Final Determination*, Commerce acknowledged that, in proceedings involving non-market-economy ("NME") countries, Commerce "begins with a rebuttable presumption that all companies within the country are subject to government control." 71 Fed. Reg. at 29,307. Based on this presumption, Commerce assigns all exporters of the subject merchandise in a NME country a single antidumping duty rate "unless an exporter can demonstrate that it is sufficiently independent so as to be entitled to a separate rate." *Id.*

Commerce initially concluded that ATM had demonstrated *de jure* and *de facto* absence of government control and, thus, qualified for a separate rate. *Id.* at 29,307. Commerce set the ATM duty rate at 2.50%. *Id.* at 29,309. DSMC appealed Commerce's rate determination to the CIT. The CIT remanded the separate rate determination to Commerce for clarification of the test applied by Commerce and for an explanation regarding Commerce's treatment of the evidence of record. *Advanced Tech. & Materials Co. v. United States*, 885 F. Supp. 2d 1343, 1348 (Ct. Int'l Trade 2012). On remand, Commerce again concluded that ATM was entitled to the separate rate of 2.50%. *Id.* at 1348–49. On appeal, the CIT once more remanded the separate rate determination to Commerce, concluding that Commerce "failed to consider important aspects of the problem and offered explanations that run

counter to the evidence before it." *Id.* at 1349. In the second remand, Commerce concluded that ATM had failed to rebut the presumption of government control. *Advanced Tech. & Materials Co. v. United States*, 938 F. Supp. 2d 1342, 1345 (Ct. Int'l Trade 2013).

Specifically, Commerce found that the State-Owned Assets Supervision and Administration Commissions of the State Council of the PRC ("SASAC"), a Chinese government agency, owned 100 percent of the China Iron & Steel Research Institute ("CISRI") during the investigation period, and CISRI held a majority share in AT&M (one of the five companies making up ATM). *Id.* CISRI placed four of its senior officials on AT&M's board, and the other five board members were all nominated by CISRI. *Id.* Because the AT&M board was active in selecting the company's management, Commerce concluded that AT&M did not choose its own management autonomously, rendering ATM part of the PRC-wide entity. *Id.* ATM's status as part of the PRC-wide entity meant that it did not qualify for a separate rate. *Id.* The CIT affirmed Commerce's conclusion, *id.* at 1345–53, and we affirmed the CIT's judgment without opinion pursuant to our Rule 36, *Advanced Tech. & Materials Co. v. United States*, 541 F. App'x 1002 (Fed. Cir. 2013).

C. First Administrative Review Proceedings

During the first administrative review, Commerce again considered whether ATM should receive a separate rate. Before the final decisions of the CIT and this court affirming Commerce's finding that ATM failed to rebut the presumption of government control in the initial investigation, Commerce again found that ATM qualified for a separate rate. *Diamond Sawblades and Parts Thereof from the People's Republic of China: Final Results of Antidumping Duty Administrative Review: 2009–2010* (*Initial Final Results*), 78 Fed. Reg. 11,143, 11,145 (Dep't of Commerce Feb. 15, 2013). Commerce set the ATM duty

rate at 0.15%. *Id.* at 11,145. After the CIT issued its decision confirming that ATM did *not* qualify for a separate rate in the initial investigation, Commerce asked for a voluntary remand in the first administrative review to reconsider its separate rate analysis in light of the CIT's decision. *See Diamond Sawblades Mfrs. Coal. v. United States* (*Remand Redetermination*), Court No. 13-00078, slip op. 14-50 (Dep't of Commerce Apr. 10, 2015), http://enforcement.trade.gov/remands/14-50.pdf.

On remand, Commerce concluded that ATM did not qualify for a separate rate because it failed to rebut the presumption of government control. *Id.* at 2–4. Commerce referenced its analysis from the initial investigation proceedings, which the CIT and this court affirmed, and concluded that, "based on the evidence on the record of this proceeding, there is no meaningful difference between the circumstances at issue in the less-than-fair-value investigation and this review . . . ." *Id.* at 3.

Because ATM failed to qualify for a separate rate, ATM was subject to the PRC-wide entity rate. *See id.* The then-governing PRC-wide entity rate was 164.09%. Commerce concluded, however, that it was appropriate to update the PRC-wide entity rate in light of information it had received from ATM during the first administrative review. *Id.* at 7–10. ATM had cooperated in the first administrative review, providing Commerce with additional information regarding a portion of the PRC-wide entity that Commerce did not have when it first calculated the PRC-wide entity rate. Commerce acknowledged that the sales and production data provided by ATM allowed it "to calculate a margin for an unspecified portion of the single PRC-wide entity." *Id.* at 8–9. Commerce explained, however, that it needed "to determine a single rate for the PRC-wide entity"; i.e., a single rate that would apply to all companies that make up the PRC-wide

entity, including ATM and the other 21 companies.[2]  *Id.*
Although Commerce had information from ATM—which
made up an unknown percentage of the PRC-wide enti-
ty—it did not have the necessary information "from the
remaining unspecified portion of the PRC-wide entity to
calculate a margin for the unspecified portion of the PRC-
wide entity."  *Id.*  Commerce also noted that it did not
have "information on the record with respect to the com-
position of the PRC-wide entity."  *Id.*

Because ATM only made up an unknown portion of
the PRC-wide entity, Commerce rejected ATM's argument
that "the entire government-controlled PRC-wide entity
should be given" the margin Commerce calculated when it
initially gave ATM a separate rate.  *Id.* at 9.  Commerce
also stated, "unlike the less-than-fair-value investigation,
no part of the PRC-wide entity failed to cooperate to the
best of its ability."  *Id.*  Given these considerations, Com-
merce decided to recalculate the PRC-wide entity rate—
which would apply to ATM and all other members of the
PRC-wide entity—by taking "a simple average of the
previously assigned PRC-wide rate (164.09 percent) and
the calculated final margin for [ATM] (0.15 percent),"
which resulted in a new PRC-wide entity rate of 82.12%.[3]
*Id.* (footnote omitted).

---

[2]    As acknowledged in the *Remand Redetermination*,
the PRC-wide entity comprised twenty-one other compa-
nies, aside from ATM, that also had failed to demonstrate
a lack of government control.  *Id.* at 10.  The other twen-
ty-one companies did not cooperate in the first adminis-
trative review.

[3]    Neither party challenges Commerce's decision to
take a simple average of the two rates as its method for
recalculating the PRC-wide entity rate based on the
information it had before it.  We therefore do not address
the reasonableness of that decision.

The CIT sustained Commerce's recalculation of the PRC-wide entity rate and the application of the new PRC-wide entity rate to ATM. *CIT Decision*, 2015 Ct. Int'l Trade LEXIS 107, at *18–28. In considering Commerce's statement that "no part of the PRC-wide entity failed to cooperate to the best of its ability," the CIT rejected ATM's argument that this amounted to a determination by Commerce of "'full' cooperation by the PRC-wide entity." *Id.* at *23. The CIT noted that ATM's argument "depends on the extent to which [ATM's] cooperation may reasonably be imputed to the remainder of the PRC entity." *Id.* The CIT concluded that "substantial evidence of record does not support" reading Commerce's statement to mean that the entire PRC-wide entity cooperated fully during the first administrative review; instead, the CIT interpreted Commerce's statement to apply only to ATM's cooperation, not that of all others who make up the PRC-wide entity. *Id.* at *23–24. The CIT also concluded that Commerce's decision was a review of the PRC-wide entity *rate* within the meaning of 19 U.S.C. § 1675(a), not a review of the makeup of the PRC-wide entity. *Id.* at *24. Based on this understanding and its review of the record, the CIT concluded that Commerce's decision was not "unreasonable, unsupported by substantial evidence, or otherwise not in accordance with law." *Id.* at *27.

## II. DISCUSSION

We apply the same standard of review used by the CIT in reviewing determinations made by Commerce. *AMS Assocs., Inc. v. United States*, 737 F.3d 1338, 1342 (Fed. Cir. 2013). We will uphold Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i); *see also Dupont Teijin Films USA, LP v. United States*, 407 F.3d 1211, 1215 (Fed. Cir. 2005).

ATM argues that the CIT and Commerce impermissibly applied the PRC-wide entity rate because it based that rate on adverse facts available ("AFA").[4]  Pursuant to 19 U.S.C. § 1677e, Commerce can use an inference "that is adverse to the interests of [a] party in selecting from among the facts otherwise available" when determining the party's rate if it finds that the interested party "has failed to cooperate by not acting to the best of its ability to comply with a request for information" from Commerce.  *Id.* § 1677e(b)(1).  ATM asserts Commerce could not apply the PRC-wide entity rate to ATM in the first administrative review because Commerce was not allowed to apply an AFA rate to a cooperating entity.

ATM specifically contends that, in accordance with 19 U.S.C. § 1677e(b), Commerce can apply adverse inferences only to a party that "has failed to cooperate by not acting to the best of its ability to comply with a request for information from the administering authority or the Commission."  19 U.S.C. § 1677e(b)(1).  Because Commerce agreed that ATM cooperated during the administrative review, ATM argues that Commerce cannot apply the PRC-wide entity rate from the investigation proceedings to ATM because the PRC-wide entity rate was calculated using AFA.  According to ATM, its cooperation in this administrative review and 19 U.S.C. § 1673d(c)(1)(B)(i) mandate that Commerce give ATM

---

[4]    During oral argument, ATM clarified that it does not challenge Commerce's ability to apply a PRC-wide entity rate under the statutory framework.  When asked whether it was asserting that Commerce cannot use a PRC-wide entity rate, as amici believed it was, ATM responded, "No.  We do not think you need to reach that in this case."  Oral Arg. at 2:19–2:29, http://oralarguments.cafc.uscourts.gov/default.aspx?fl=2016-1253.mp3.

either an individual rate or an "estimated all-others rate" for parties not individually investigated.  ATM also argues that Commerce's decision in this case will "eliminate[] any incentive for cooperation by the PRC-wide entity, which will be given AFA regardless of whether it cooperates or not.  Such an outcome is neither in keeping with statutory requirements or sound policy."  Appellant's Br. 24–25.

ATM's position ignores the effect of its failure to rebut the presumption of government control.  In *Sigma Corp. v. United States*, we considered Commerce's decision to assign certain manufacturers a single country-wide rate for their antidumping duty rates.  117 F.3d 1401, 1405 (Fed. Cir. 1997).  Commerce had concluded that, because the PRC is a NME country, "all commercial entities in the country are presumed to export under the control of the state, and that no manufacturer would receive a separate antidumping duty rate unless it could demonstrate that it enjoyed both de jure and de facto independence from the central government."  *Id.*  We noted that Commerce "has broad authority to interpret the antidumping statute and devise procedures to carry out the statutory mandate."  *Id.*  We agreed that "it was within Commerce's authority to employ a presumption of state control for exporters in a [NME country], and to place the burden on the exporters to demonstrate an absence of central government control."  *Id.*

Since our decision in *Sigma Corp.*, we consistently have sustained Commerce's application of a rebuttable presumption of government control to exporters and producers in NME countries, such as the PRC.  *See, e.g.*, *Changzhou Hawd Flooring Co. v. United States*, 848 F.3d 1006, 1009 (Fed. Cir. 2017) (noting that Commerce "presumes that each Chinese exporter and producer is state-controlled, and thus covered by a single China-wide antidumping-duty rate, but a firm may rebut the presumption"); *Michaels Stores, Inc. v. United States*, 766

F.3d 1388, 1390 (Fed. Cir. 2014) ("In NME proceedings, Commerce begins with a rebuttable presumption that a company operating within a NME is subject to state control."); *Changzhou Wujin Fine Chem. Factory Co. v. United States*, 701 F.3d 1367, 1370 (Fed. Cir. 2012) ("In proceedings involving [NME] countries, including China, Commerce presumes that exporters and producers are state-controlled, and assigns them a single state-wide rate.").  If a company from the NME country rebuts the presumption by showing its independence from state control, it can qualify for a separate rate; if the company fails to rebut the presumption, however, it receives the single state-wide dumping rate. *See, e.g.*, *Michaels Stores*, 766 F.3d at 1390 ("Commerce therefore applies a single country-wide antidumping deposit rate to *all* NME producers and exporters, unless the producer, exporter, or another interested party can prove through an administrative review process (established by 19 C.F.R. § 351.213(b)) that the exporter or producer at issue is not subject to government control and thus eligible for a lower rate."); *Changzhou Wujin*, 701 F.3d at 1370 (noting that a party who fails to rebut the presumption of state control receives "a single state-wide rate" but that the presumption is rebuttable such that "a company that demonstrates sufficient independence from state control may apply to Commerce for a separate rate."); *Transcom, Inc. v. United States*, 294 F.3d 1371, 1373 (Fed. Cir. 2002) ("Under the NME presumption, a company that fails to demonstrate independence from the NME entity is subject to the countrywide rate, while a company that demonstrates its independence is entitled to an individual rate as in a market economy.").

In the first administrative review, ATM cooperated with Commerce and sought a separate rate, just as it did—with initial success—in the investigation proceedings. *See Initial Final Results*, 78 Fed. Reg. at 11,145. But Commerce ultimately concluded, in accordance with

the decisions rendered by the CIT and this court in the investigation proceedings, that ATM failed to rebut the presumption of government control. *Remand Redetermination*, slip op. 14-50, at 2–4. ATM thus received the PRC-wide entity rate. *See Transcom*, 294 F.3d at 1373 ("Under the NME presumption, a company that fails to demonstrate independence from the NME entity is subject to the countrywide rate . . . ."). Commerce's decision to assign ATM the PRC-wide entity rate was fully in accordance with our case law addressing the application of the PRC-wide entity rate to companies that fail to show an absence of government control. *See Michaels Stores*, 766 F.3d at 1390; *Changzhou Wujin*, 701 F.3d at 1370; *Transcom*, 294 F.3d at 1373.

The statutory framework, including 19 U.S.C. §§ 1673d and 1677e(b), is not to the contrary. We have explained that 19 U.S.C. § 1673d "applies on its face only to investigations, not periodic administrative reviews." *Albemarle Corp. v. United States*, 821 F.3d 1345, 1352 (Fed. Cir. 2016). "The statute also explicitly applies only to market economy proceedings," rather than NME proceedings. *Id.* at 1352 n.6. But since the statutory framework requires Commerce to employ the same methods for calculating a separate rate in periodic administrative reviews for market economies as it does in initial investigations, Commerce has adopted that statutory framework in NME proceedings as well. *Id.* at 1352 & n.6.

Although Commerce generally applies the statutory framework to administrative reviews involving a NME country like the PRC, it continues to have "broad authority to interpret the antidumping statute and devise procedures to carry out the statutory mandate." *Sigma Corp.*, 117 F.3d at 1405. Because the statutory framework does not directly apply to administrative review proceedings involving a NME country, Commerce maintains its broad authority to devise alternate procedures to carry out the statutory mandate. We find nothing in the statutory

framework that would require us to depart from our conclusion in *Sigma Corp.* that Commerce acted within its authority when it "employ[ed] a presumption of state control for exporters in a [NME country], and [placed] the burden on the exporters to demonstrate an absence of central government control." *Id.* Because ATM failed to rebut the presumption of government control, Commerce's decision to apply the PRC-wide entity rate to ATM was not contrary to law.

The fact that a country-wide rate may have been calculated using AFA does not change its applicability to a NME entity that cooperated, but ultimately failed to qualify for a separate rate. This court's reasoning in *Transcom*, although addressing a slightly different factual scenario, is instructive on this point. In that case, Transcom argued that Commerce improperly applied a best information available ("BIA")[5] rate to Transcom's producers and suppliers because Commerce had failed to show that the producers and suppliers had not cooperated with Commerce's investigation. 294 F.3d at 1380–81. According to Transcom, Commerce's imposition of a BIA rate under those circumstances violated § 1677e, "which prohibits Commerce from imposing BIA-based rates on a company that had not refused to provide information or otherwise failed to cooperate in Commerce's investigation." *Id.* at 1381. But this court rejected Transcom's argument that § 1677e does not allow Commerce to apply a BIA rate to an entity that had not failed to cooperate with Commerce; we explained:

---

[5]    ATM explains that BIA is "the older term for AFA." Appellant's Br. 28. Indeed, BIA "was the precursor to the current 'adverse inference' from 'facts otherwise available' rule." *Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1339 (Fed. Cir. 2002).

> That argument sidesteps the core principle under-lying the NME presumption, because it proceeds from the unspoken assumption that the producers are independent of the NME entity, when in fact the NME presumption begins with the assumption that the producers are part of the NME entity until they prove otherwise. If the producers are assumed from the outset to be part of the NME entity, then Commerce's conclusion that the NME entity is subject to a BIA-based rate logically requires Commerce to apply the same BIA-based rate to all other producers within the scope of the review that have not proved their independence of the state.

*Id.*

In this case, ATM similarly argues that § 1677e does not allow Commerce to apply an AFA rate to a cooperating party. ATM asserts that Commerce calculated the PRC-wide entity rate using AFA during the investigation proceedings, so Commerce cannot apply the PRC-wide entity rate to ATM after the first administrative review because ATM cooperated in that review. But this argument "sidesteps the core principle underlying the NME presumption." *Id.* Since the beginning of this first administrative review, Commerce has acknowledged that the PRC-wide entity is composed of numerous entities that all received a PRC-wide entity rate of 164.09%. *See Initial Final Results*, 78 Fed. Reg. at 11,145 & n.20. Commerce's NME presumption begins by assuming that ATM is part of the PRC-wide entity unless it can prove otherwise. Because ATM failed to rebut the presumption of government control, Commerce's conclusion that the PRC-wide entity is subject to an AFA-based rate logically requires Commerce to apply the same AFA-based rate to all members of the PRC-wide entity that have not proven

their independence from the state, including ATM.[6]  *See Transcom*, 294 F.3d at 1381.  Commerce's decision, therefore, is not contrary to law.

---

[6]      ATM points to the CIT's decision in *China Manufacturers Alliance, LLC v. United States* as supplemental authority in support of its position.  205 F. Supp. 3d 1325 (Ct. Int'l Trade 2017).  In *China Manufacturers Alliance*, Commerce calculated a dumping margin of 0.69% for an entity but then assigned the entity the PRC-wide entity rate because the entity failed to rebut the presumption of government control.  The CIT concluded that Commerce erred in assigning the entity the PRC-wide entity rate. The CIT reasoned that the statutory framework required Commerce to give the entity the rate it calculated based on the entity's status as a mandatory respondent, even though the entity failed to rebut the presumption of state control.  DSMC and the United States argue that the CIT erred in *China Manufacturers Alliance* when it attempted to distinguish that case from its decision in *Advanced Technology & Materials*, 938 F. Supp. 2d at 1350–51, which this court affirmed.  DSMC and the CIT are correct. ATM, or at least a component of it, was selected as a mandatory respondent in the investigation into the dumping of diamond sawblades.  *See Investigation Preliminary Determination*, 70 Fed. Reg. at 77,122, 77,127–28.  The CIT's analysis in *China Manufacturers Alliance* suffers from the same deficiencies as ATM's arguments in this appeal.  The analysis does not properly apply our precedent upholding Commerce's use of the PRC-wide entity rate for companies that fail to rebut the presumption of government control and is incompatible with the underlying NME presumption.  *See Transcom*, 294 F.3d at 1381. Accordingly, we do not find the CIT's decision in *China Manufacturers Alliance* persuasive.

ATM tries to avoid this conclusion by latching onto Commerce's statement in the *Remand Redetermination* that, "unlike the less-than-fair-value investigation, no part of the PRC-wide entity failed to cooperate to the best of its ability." *Remand Redetermination*, slip op. 14-50, at 9. But ATM takes this sentence out of the context provided by the remainder of Commerce's decision. Commerce expressly found that the PRC-wide entity included ATM *and 21 other companies. Id.* at 9–10. ATM attempts to distance itself from those companies by claiming that they are not affiliated with ATM or they do not make up part of the PRC-wide entity. But Commerce expressly found that they are part of the PRC-wide entity. *See Initial Final Results*, 78 Fed. Reg. at 11,145 & n.20. Given the full context of Commerce's opinion and its discussion in the *Initial Final Results*, we do not believe Commerce's single statement overrides its findings regarding the makeup of the PRC-wide entity. Instead, we understand this statement as a recognition that ATM cooperated to the best of *its* ability in this first administrative review. Commerce did not address the cooperation—or lack thereof—of other companies that make up the PRC-wide entity.

ATM also attempts to avoid the PRC-wide entity rate by arguing that the information supporting the PRC-wide entity rate of 164.09% from the investigation proceedings was not on the record of this administrative review. According to ATM, the lack of evidence supporting the calculation of the 164.09% rate renders Commerce's decision applying the PRC-wide entity rate to ATM unsupported by substantial evidence. But this argument again ignores the nature of the PRC-wide entity rate. Commerce did not calculate a new separate rate for ATM in this administrative review; it was applying the NME presumption that ATM would receive the existing PRC-wide entity rate unless it could show an absence of government control. As mentioned above, we have upheld

this method of applying the PRC-wide entity rate to any company that does not qualify for a separate rate on numerous occasions. *See Transcom*, 294 F.3d at 1373; *Changzhou Wujin*, 701 F.3d at 1370; *Michaels Stores*, 766 F.3d at 1390; *Albemarle*, 821 F.3d at 1348. Commerce also acknowledged the historical PRC-wide entity rate from the beginning of this administrative review. *See Initial Final Results*, 78 Fed. Reg. at 11,145. We therefore find no issue with Commerce's use of the previously established PRC-wide entity rate to calculate an updated PRC-wide entity rate that applies to ATM in this administrative review and conclude that Commerce's conclusions are supported by substantial evidence.

Our decision is not inconsistent with our decision in *Albemarle*. There, we considered an administrative review of antidumping duty rates for three companies from the PRC. *See Albermarle*, 821 F.3d at 1347–48. Commerce determined that all of the parties to the appeal were entitled to separate rates, so the central issue involved "the calculation of those separate rates." *Id.* at 1348. Rather than calculate a separate rate for each of the three companies in the administrative review, however, Commerce merely carried forward the rates used from a previous administrative review and applied those as the separate rates for the administrative review at issue. *See id.* at 1347–51. We concluded that the record in that case did not support Commerce's ability to carry forward the separate rates of the three companies from a previous administrative review to the administrative review at issue. *See id.* at 1351–59.

But our decision in *Albemarle* acknowledged at the outset that, "[i]n proceedings involving [NME] countries, including China, Commerce presumes that exporters are state-controlled, *and assigns them a single state-wide dumping rate.*" *Id.* at 1348 (emphasis added). *Albemarle* therefore drew a distinction between the calculation of separate rates for individual companies that qualify for

such a rate and the application of the PRC-wide entity rate to all companies that do not so qualify. *See id.* at 1348, 1351–53.

Commerce's action in this case also complies with the general admonition in *Albemarle* that administrative reviews should "be as accurate <u>and current</u> as possible." 821 F.3d at 1356 (quoting *Allegheny Ludlum Corp. v. United States*, 346 F.3d 1368, 1373 (Fed. Cir. 2003)). In this review, Commerce used the information it received from ATM to recalculate the PRC-wide entity rate so that it would reflect the most recent information it had received from members of the PRC-wide entity. *Remand Redetermination*, slip op. 14-50, at 9. Commerce acknowledged that it did not have sufficient information from all members of the PRC-wide entity to allow it to calculate "a margin for the unspecified portion of the PRC-wide entity," but it accounted for the new information it received from ATM by taking an average of the two calculated rates and reducing the PRC-wide entity rate from 164.09% to 82.12%. *Id.* Commerce's actions are supported by substantial evidence and are not contrary to law.

## III. CONCLUSION

A party in a NME country, such as ATM, must cooperate with Commerce if it hopes to receive a separate rate rather than the single rate applied to the country-wide entity. But, if the party, despite its cooperation, fails to rebut the presumption of government control, the party remains part of the country-wide entity and therefore receives the country-wide entity rate. In other words, the fact of cooperation may help an entity in a NME country seek a reduction of the country-wide rate, as it did here, but it does not, without more, save it from that rate. As discussed above, we have reaffirmed this proposition numerous times since *Sigma Corp. See Transcom*, 294 F.3d at 1373; *Changzhou Wujin*, 701 F.3d at 1370;

*Michaels Stores*, 766 F.3d at 1390; *Albemarle*, 821 F.3d at 1348. Because ATM failed to rebut the presumption of government control, it remained part of the PRC-wide entity and received the PRC-wide entity rate.

For the foregoing reasons, we affirm the CIT's decision sustaining Commerce's application of the recalculated PRC-wide entity rate to ATM.

### AFFIRMED

COSTS

No costs.