# United States Court of Appeals for the Federal Circuit

---

**DIAMOND SAWBLADES MANUFACTURERS COALITION,**
*Plaintiff-Appellee*

**v.**

**HYOSUNG D&P CO., LTD., EHWA DIAMOND INDUSTRIAL CO., LTD.,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES, SH TRADING, INC., SHINHAN DIAMOND INDUSTRIAL CO. LTD.,**
*Defendants-Appellees*

---

2015-1216, 2015-1224

---

Appeals from the United States Court of International Trade in Nos. 1:06-cv-00248-RKM, 1:09-cv-00508-RKM, 1:09-cv-00509-RKM, 1:09-cv-00510-RKM, Senior Judge R. Kenton Musgrave.

---

Decided: December 14, 2015

---

DANIEL B. PICKARD, Wiley Rein, LLP, Washington, DC, argued for plaintiff-appellee. Also represented by MAUREEN E. THORSON.

JEFFREY S. GRIMSON, Mowry & Grimson, PLLC, Washington, DC, argued for plaintiff-appellant Hyosung D&P Co., Ltd. Also represented by JILL A. CRAMER, KRISTIN HEIM MOWRY, SARAH M. WYSS.

MARK PARDO, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, Washington, DC, argued for plaintiff-appellant Ehwa Diamond Industrial Co., Ltd. Also represented by ANDREW THOMAS SCHUTZ; MAX FRED SCHUTZMAN, NED H. MARSHAK, BRUCE M. MITCHELL, New York, NY.

ALEXANDER V. SVERDLOV, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee United States. Also represented by FRANKLIN E. WHITE, JR., BENJAMIN C. MIZER; AMAN KAKAR, Office of Chief Counsel for Trade Enforcement and Compliance, United States Department of Commerce, Washington, DC.

MICHAEL PAUL HOUSE, Perkins Coie, LLP, Washington, DC, for defendants-appellees SH Trading, Inc., Shinhan Diamond Industrial Co., Ltd. Also represented by DAVID JOHN TOWNSEND.

———————————

Before TARANTO, PLAGER, and LINN, *Circuit Judges.*

TARANTO, *Circuit Judge.*

In late 2006, the Department of Commerce announced that it was changing one of the methods it uses to calculate whether imported goods are being sold in the United States at less than fair value, *i.e.*, being dumped. Commerce also addressed the issue of what dumping proceedings would be governed by the new policy, which generally made it more difficult to find dumping. When two companies found to have dumped in the present case—

Hyosung D&P Co., Ltd. and Ehwa Diamond Industrial Co., Ltd.—argued that their case is among those governed by the new policy, Commerce disagreed. We uphold Commerce's determination, because Commerce spoke ambiguously on the timing issue in adopting its new policy and Commerce reasonably resolved the ambiguity to exclude the present matter.

BACKGROUND

A

Commerce and the International Trade Commission share responsibility for investigations about whether an antidumping duty should be imposed on goods being imported in the United States, and they proceed in two stages—first making certain preliminary determinations and then, for those investigations which proceed, making final determinations. *See* 19 U.S.C. §§ 1673–1677n. Commerce investigates and ultimately determines whether the goods at issue are being or are likely to be sold in the United States at less than fair value, as measured in various ways specified by statute. §§ 1673(1), 1673d(a), 1677–1677n. The Commission determines whether a domestic industry is "materially injured" or threatened with material injury, or whether establishment of a domestic industry is materially retarded, by reason of imports or sales for which Commerce has made an affirmative determination (*i.e.*, found dumping). §§ 1673(2), 1673d(b)(1). The statute provides for issuance of an antidumping-duty order—imposing import duties in amounts keyed to the magnitude of the underpricing—if both agencies make the specified affirmative final determinations against the imports, and it provides for termination of the investigation if either agency does not make those determinations. §§ 1673, 1673d(c)(2); *see* 19 C.F.R. §§ 351.205(a), 351.210(a). Specified determinations of Commerce and the Commission are reviewable in the

Court of International Trade, 19 U.S.C. § 1516a, and then this court, 28 U.S.C. § 1295(a)(5).

Commerce sometimes determines whether dumping is occurring, and if so in what amounts, by examining certain pools of goods and calculating an average amount by which they are being sold at less than fair market value. 19 U.S.C. § 1677(35). Before early 2007, Commerce employed "zeroing" in making that calculation: for goods sold above fair value, Commerce treated the sale price as being at (rather than above) fair value—it zeroed out the margins above fair value. Thus, Commerce permitted no offset against below-fair-value sales in the calculation of the average, resulting in larger average dumping margins than if offsetting had been allowed. *See Union Steel v. United States*, 713 F.3d 1101, 1104 (Fed. Cir. 2013); *Corus Staal BV v. Dep't of Commerce*, 395 F.3d 1343, 1347 (Fed. Cir. 2005); *Advanced Tech. & Materials Co. v. United States*, 33 I.T.R.D. 1874 (Ct. Int'l Trade 2011); *Antidumping Proceedings: Calculation of the Weighted-Average Dumping Margin During an Antidumping Investigation; Final Modification*, 71 Fed. Reg. 77,722 (Dec. 27, 2006) (*Final Modification*).

On October 31, 2005, the World Trade Organization issued a report stating that Commerce's practice of zeroing in certain investigations violated the WTO Antidumping Agreement. *See Advanced Tech.*, 33 I.T.R.D. at 1874. Commerce responded by proposing a formal change in its methodology for calculating dumping margins in investigations, following the notice-and-comment procedures specified in 19 U.S.C. § 3533 for adopting revisions of policies based on certain WTO determinations. It published a notice in the Federal Register on March 6, 2006, proposing to abandon its policy of zeroing and seeking public comment. *Antidumping Proceedings: Calculation of the Weighted Average Dumping Margin During an Antidumping Duty Investigation*, 71 Fed. Reg. 11,189 (Dep't of Commerce Mar. 6, 2006). In its "Timeta-

ble" section, Commerce proposed that the new policy would apply only to "investigations initiated on the basis of petitions received on or after the first day of the month following the date of publication of the Department's final notice" of the new policy. *Id.* at 11,189.

On December 27, 2006, after receipt of public comments, Commerce published its final modification, explaining that it would indeed discontinue its practice of zeroing in investigations. *Final Modification, supra.* Commerce departed from its initially proposed policy, however, in the respect at issue here: it expanded the pool of investigations to which the new policy would apply, no longer limiting its application to new investigations. In its "Timetable" section, which the "Summary" identified as setting forth the schedule for implementing the change, 71 Fed. Reg. at 77,722, Commerce stated that the change in policy would apply "in all current and future antidumping investigations as of the effective date." *Id.* at 77,725. In the "Analysis of Final Comments" section, Commerce stated that it had "determined to apply the final modification adopted through this proceeding to all investigations *pending before the Department* as of the effective date." *Id.* (emphasis added). And it noted that there were only seven such investigations, all of them initiated by petitions filed after March 6, 2006, when the new no-zeroing policy was proposed. *Id.*

Commerce set January 16, 2007, as the effective date for the new policy. *Id.*; *id.* at 77,722. Commerce later changed the effective date to February 22, 2007. *Antidumping Proceedings: Calculation of the Weighted-Average Dumping Margins in Antidumping Investigations; Change in Effective Date of Final Modification*, 72 Fed. Reg. 3,783 (Dep't of Commerce Jan. 26, 2007).

## B

On June 21, 2005—many months before the March 2006 proposal to end zeroing—Commerce began investi-

gating possible dumping by several Chinese and Korean producers and exporters of diamond sawblades (circular sawblades made partly of diamonds). *Initiation of Antidumping Duty Investigations: Diamond Sawblades and Parts Thereof from the People's Republic of China and the Republic of Korea*, 70 Fed. Reg. 35,625 (Dep't of Commerce Jun. 21, 2005). On May 22, 2006, Commerce published its final determination that two companies, appellants Hyosung and Ehwa, had engaged in dumping. *Notice of Final Determination of Sales at Less Than Fair Value and Final Determination of Critical Circumstances: Diamond Sawblades and Parts Thereof from the Republic of Korea*, 71 Fed. Reg. 29,310 (Dep't of Commerce May 22, 2006) (*Commerce Final Determination*). Commerce used zeroing in calculating an average dumping margin for each company. *Id.*[1]

Under the statutory regime, after Commerce reached its final determination, the Commission made its final determination regarding domestic-industry injury. In July 2006, the Commission found no such injury. *Diamond Sawblades and Parts Thereof From China and Korea*, 71 Fed. Reg. 39,128 (Jul. 11, 2006). In late July 2006, the Diamond Sawblades Manufacturers Coalition— a group of domestic producers, which filed the petition that prompted Commerce's investigation here— challenged the Commission's determination in the Court of International Trade under 19 U.S.C. § 1516a(a)(2)(B)(ii). *See* Ehwa Br. 5. The matter was in

---

[1]    Issues & Decisions Memorandum for the Final Determination in the Antidumping Investigation of Diamond Sawblades and Parts Thereof from the People's Republic of Korea, May 15, 2006, at 40–42, http://enforcement.    trade.gov/frn/summary/KOREA-SOUTH/E6-7771-1.pdf.

the Court of International Trade when, in December 2006, Commerce adopted its new no-zeroing policy.

In February 2008, well after the early-2007 effective date of the new no-zeroing policy, the Court of International Trade remanded the matter to the Commission for further consideration. *Diamond Sawblades Mfrs. Coal. v. United States*, 32 C.I.T. 134 (Feb. 6, 2008). In May 2008, the Commission found threatened material injury. *Diamond Sawblades & Parts Thereof from China & Korea*, USITC Inv. Nos. 731-TA-1092 and -1093, USITC Pub. 4007 (May 2008). That determination was sustained by the Court of International Trade in January 2009, *Diamond Sawblades Mfrs. Coal. v. United States*, 33 C.I.T. 48 (Jan. 13, 2009), and this court later affirmed, *Diamond Sawblades Mfrs. Coal. v. United States*, 612 F.3d 1348, 1350 (Fed. Cir. 2010).

While the merits were on appeal in this court, the Court of International Trade issued a writ of mandamus directing Commerce to publish an antidumping-duty order. *Diamond Sawblades Mfrs. Coal. v. United States*, 650 F. Supp. 2d 1331, 1334 (Ct. Int'l Trade 2009). Commerce did so on November 4, 2009, using the calculations it had made in May 2006 using zeroing. *Diamond Sawblades and Parts Thereof From the People's Republic of China and the Republic of Korea: Antidumping Duty Orders*, 74 Fed. Reg. 57,145 (Dep't of Commerce Nov. 4, 2009). This court eventually affirmed the mandamus order. *Diamond Sawblades Mfrs. Coal. v. United States*, 626 F.3d 1374, 1382–83 (Fed. Cir. 2010).

Hyosung and Ehwa filed challenges in the Court of International Trade. With the court's permission, Commerce corrected some ministerial errors in its final determination. *Amended Final Determination of Sales at Less Than Fair Value: Diamond Sawblades and Parts Thereof From the Republic of Korea*, 75 Fed. Reg. 14,126 (Dep't of Commerce March 24, 2010). In 2013, the Court

of International Trade decided the issue now presented for decision to us: it held that Commerce did not err by deeming its new no-zeroing policy inapplicable to the calculation of the dumping margin in this matter. *Diamond Sawblades Mfrs. Coal. v. United States*, 2013 WL 5878684 (Ct. Int'l Trade 2013).

The Court of International Trade entered a final decision on October 29, 2014. J.A. 1. Hyosung and Ehwa timely appealed. We have jurisdiction under 28 U.S.C. § 1295(a)(5).

## DISCUSSION

Because we are presented only with a legal question, we decide this dispute de novo: we apply the same standard applied by the Court of International Trade, asking if the Commerce decision at issue is "not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). *See Michaels Stores, Inc. v. United States*, 766 F.3d 1388, 1391 (Fed. Cir. 2014). The question is not whether Commerce committed any reversible error in what it decided in the *Final Modification* about which dumping proceedings would be governed by the new no-zeroing policy; the question is only what it did decide. As to that interpretive question, it is undisputed that it suffices for us to uphold Commerce's answer if we conclude that the *Final Modification* is ambiguous on the point and Commerce's interpretation is a reasonable resolution of the ambiguity. *See Auer v. Robbins*, 519 U.S. 452, 461 (1997); *Michaels Stores*, 766 F.3d at 1391; *Cathedral Candle Co. v. Int'l Trade Comm'n*, 400 F.3d 1352, 1364 (Fed. Cir. 2005).

In the investigation at issue here, Commerce had, by the *Final Modification*'s effective date of February 2007, completed its non-ministerial work, making a "final determination" of dumping in May 2006. Even the Commission had completed its work, making a negative injury determination in July 2006. The matter was pending before the Court of International Trade. And when it

returned to Commerce in 2009, Commerce had no more than ministerial work to complete in order to issue an antidumping-duty order.

We conclude that the *Final Modification* is at best ambiguous as it applies to the present matter. In fact, aspects of the *Final Modification* strongly support Commerce's determination. We therefore uphold Commerce's determination that the no-zeroing policy does not apply here.

As we have noted, the *Final Modification*'s Timetable section says that the new policy will apply "in all current and future antidumping investigations as of the effective date," 71 Fed. Reg. at 77,725, while an explanatory statement in the response to public comments, within a section entitled "Whether Implementation Should Apply to On-Going Investigations," says that "the Department has determined to apply the final modification adopted through this proceeding to all investigations pending before the Department as of the effective date," *id.* at 77,724-25. We need not decide whether even the former language, if it stood alone, might properly be read to exclude a matter, like this one, that was not before *either* Commerce *or* the Commission in February 2007 and did not thereafter return to Commerce for non-ministerial work. The "current . . . investigations" language does not stand alone, but is accompanied by the facially narrower language, "pending before the Department," which we must take as explanation, not a statement of an inconsistent position. At least when read together, the language can reasonably be given Commerce's interpretation—as not reaching investigations in which Commerce had already made a final determination of whether dumping was taking place (by February 2007) and did not thereafter return to Commerce for substantive determinations.

The two-agency structure of antidumping investigations admits of that view. To be sure, one might well treat an "investigation," under the statute and regulations, as a single matter that is "pending" before both Commerce and the Commission from the time it is initiated until it results in a termination or rescission of the investigation or issuance of an antidumping-duty order. *Cf.* 19 C.F.R. § 351.102(b)(30) (defining "investigation"). But that is not the only facially reasonable view. As relevant here, it also makes linguistic and structural sense to view the investigation as pending before Commerce until Commerce completes *its* work, except for any ministerial work like correcting arithmetic errors or formal entry of an order, and then pending only before the Commission for its injury determination, which comes later. 19 U.S.C. § 1673d(b) (Commission makes injury determination only as to imports or sales "with respect to which [Commerce] has made an affirmative determination" of dumping). The agencies, after all, investigate different aspects of a dumping allegation: Commerce investigates whether dumping has occurred, and Commerce investigates whether such dumping has or had or threatens certain domestic effects.

That view makes particular sense in determining the application of the *Final Modification* to the present matter, because there is powerful internal evidence that the *Final Modification* was not meant to apply to the *Diamond Sawblades* investigation. *First*: Commerce explained in the *Final Modification* that "[a]ll of the currently pending investigations were initiated as a result of petitions filed after the date of publication of the Department's proposed modification," *i.e.*, March 6, 2006. 71 Fed. Reg. at 77,725. The petitions in this case were filed much earlier—in 2005. 70 Fed. Reg. at 35,625. *Second*: When Commerce stated in the *Final Modification* that it would apply to "all investigations pending before the Department as of the effective date," it also stated that

"[t]he number of pending antidumping investigations is few (i.e. there are seven ongoing antidumping investigations)." 71 Fed. Reg. at 77,725. Hyosung, Ehwa, and Commerce all agree in this court that this investigation is not one of the seven investigations (which consist of those filed after March 6, 2006). *See* Hyosung Br. 33; Ehwa Br. 31 n.7; Gov't Br. 16 n.3. Diamond Sawblades does not disagree. Diamond Sawblades Br. 2. *Third*: Commerce explained that "even in the most advanced of the on-going investigations, there is sufficient time to permit the parties to comment on the application of this approach *prior to the final determination in the investigation*." 71 Fed. Reg. at 77,725 (emphasis added); *see id.* (in investigations where Commerce had made a preliminary determination, parties will have an opportunity to comment on application of the new policy). The implication is that Commerce had not made a final determination in any of the investigations to which the new policy would apply; but in this matter, Commerce had already done so. 71 Fed. Reg. at 29,310.

Later events in this investigation did not make this a new investigation (a "future antidumping investigation[]," 71 Fed. Reg. at 77,725) or make unreasonable the conclusion that this investigation had not been pending before Commerce in February 2007. When Commerce took up the *Diamond Sawblades* matter again in 2009, after the Court of International Trade upheld the Commission's finding of injury (after remand), Commerce performed only ministerial actions. It issued the antidumping-duty order based on its 2006 determination, 74 Fed. Reg. at 57,145, then made a ministerial correction based on an arithmetic error it had recognized in June 2006 but not implemented at the time, because the Commission had the matter before it. *See Amended Final Determination of Sales at Less Than Fair Value: Diamond Sawblades and Parts Thereof From the Republic of Korea*, 75 Fed. Reg.

14,126 (Mar. 24, 2010). Hyosung and Ehwa have pointed to no more substantive actions that Commerce took.

Hyosung and Ehwa argue that the treatment of this investigation as outside the *Final Modification* is contradicted by Commerce's later decision to apply the *Final Modification* to a separate investigation, *Polyvinyl Alcohol From Taiwan: Final Determination of Sales at Less Than Fair Value*, 76 Fed. Reg. 5562 (Feb. 1, 2011). Commerce's decision in the Polyvinyl Alcohol From Taiwan matter gives us pause in assessing the coherence of Commerce's interpretation of the *Final Modification*. But we do not think, in the end, that Commerce's decision in that matter suffices to make unreasonable Commerce's decision that the no-zeroing policy of the *Final Modification* is inapplicable here.

In the Polyvinyl Alcohol From Taiwan matter the Commission issued a preliminary determination of insufficient injury before Commerce reached even a preliminary determination as to whether dumping had occurred, and the Commission's negative preliminary determination precluded Commerce from going forward. *Initiation of Anti Dumping Duty Investigation: Polyvinyl Alcohol From Taiwan*, 69 Fed. Reg. 59,204 (Oct. 4, 2004); *Polyvinyl Alcohol From Taiwan*, 69 Fed. Reg. 63,177 (Oct. 29, 2004). At the time the *Final Modification* took effect, therefore, the Polyvinyl Alcohol From Taiwan matter had not been the subject of a Commerce final determination; by February 2007, the matter had just been remanded to the Commission for reconsideration of its preliminary injury determination. *See Celanese Chems. Ltd. v. United States*, 31 Ct. Int'l Trade 279, 280 (Jan. 29, 2007). Only in March 2010 did the matter return to Commerce, and only then did Commerce do the extensive work involved in reaching a final determination of dumping— questionnaire issuance, verification, scope amendment, etc. *See Polyvinyl Alcohol From Taiwan: Preliminary*

*Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 75 Fed. Reg. 55,552 (Sep. 13, 2010); *see* 76 Fed. Reg. at 5,562. In particular, only then did Commerce calculate the respondent's average dumping margin, which it had not previously done in this matter. 75 Fed. Reg. at 55,558.

Commerce could readily decide that the Polyvinyl Alcohol From Taiwan proceeding was situated differently from the present matter regarding the "final determination" point mentioned by Commerce in the *Final Modification*, 71 Fed. Reg. at 77,722, 77,725. The key Commerce work, including the margin determinations to which zeroing is relevant, was not yet done there, whereas here it was. That work was done only after the *Final Modification*'s effective date, whereas here no such work was done after the effective date. Thus, for reasons not applicable here, the investigation in the Polyvinyl Alcohol From Taiwan matter to which the no-zeroing policy was applied can be described as a "future" investigation, as of February 2007, insofar as Commerce's active role was concerned. We need not decide whether, as Commerce briefly suggested at oral argument, the investigation might be described, in the alternative, as having been "pending before the Department" in February 2007 within the meaning of the *Final Modification* (Commerce's work in the overall investigation got interrupted well before it arrived at a dumping determination, and the matter had been remanded to the Commission by February 2007).

Those considerations ultimately seem to us enough to prevent Commerce's result in the Polyvinyl Alcohol From Taiwan matter from making its result here unreasonable. And that is so even though neither matter was among the seven mentioned by Commerce in the *Final Modification* (both were initiated before March 2006). We think it reasonable for Commerce to treat the issue of coverage as one to be assessed by looking at the *Final Modification* as

a whole, not any single word ("pending" or "current") from its text. The particularly strong reasons that support a finding of non-coverage of the present matter are not contradicted by the weaker case for finding coverage of Polyvinyl Alcohol From Taiwan.

CONCLUSION

We affirm the judgment of the Court of International Trade.

**AFFIRMED**