# United States Court of Appeals for the Federal Circuit

---

**CHANGZHOU TRINA SOLAR ENERGY CO., LTD., TRINA SOLAR (CHANGZHOU) SCIENCE & TECHNOLOGY CO., LTD., TRINA SOLAR (U.S.) INC.,**
*Plaintiffs-Appellees*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

**v.**

**SOLARWORLD AMERICAS, INC.,**
*Defendant-Appellant*

---

2020-1004

---

Appeal from the United States Court of International Trade in Nos. 1:17-cv-00199-CRK, 1:17-cv-00217-CRK, Judge Claire R. Kelly.

---

Decided: September 3, 2020

---

JONATHAN FREED, Trade Pacific PLLC, Washington, DC, argued for plaintiffs-appellees. Also represented by ROBERT GOSSELINK.

JOSHUA E. KURLAND, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by ETHAN P. DAVIS, JEANNE DAVIDSON, REGINALD THOMAS BLADES, JR.; IAN ANDREW MCINERNEY, Office of the Chief Counsel for Trade Enforcement and Compliance, United States Department of Commerce, Washington, DC.

TIMOTHY C. BRIGHTBILL, Wiley Rein, LLP, Washington, DC, argued for defendant-appellant. Also represented by LAURA EL-SABAAWI, DOUGLAS C. DREIER, STEPHEN JOSEPH OBERMEIER, JOHN ALLEN RIGGINS, ENBAR TOLEDANO.

—————————————

Before DYK, WALLACH, and CHEN, *Circuit Judges.*

WALLACH, *Circuit Judge.*

Appellees Changzhou Trina Solar Energy Co., Ltd., Trina Solar (Changzhou) Science & Technology Co., Ltd., and Trina Solar (U.S.), Inc. (collectively, "Trina") filed suit against Appellee the United States ("Government") in the U.S. Court of International Trade ("CIT"), challenging the U.S. Department of Commerce's ("Commerce") final results in the first administrative review of the antidumping ("antidumping" or "AD") duty order covering certain crystalline silicon photovoltaic products from the People's Republic of China ("PRC"). *See Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China*, 82 Fed. Reg. 32,170, 32,172 (Dep't of Commerce July 12, 2017) (final results) ("*Final Results*"). Appellant SolarWorld Americas, Inc. ("SolarWorld"), a domestic producer of like products, participated as petitioner and defendant-intervenor. The CIT remanded "Commerce's decision not to offset" Trina's export price by a countervailed export subsidy as "contrary to law," instructing Commerce "to recalculate Trina's [export] price[]" with the offset, while sustaining, inter alia, "Commerce's surrogate value selection[] for

valuing . . . module glass." *Changzhou Trina Solar Energy Co. v. United States* (*Trina I*), 359 F. Supp. 3d 1329, 1344 (Ct. Int'l Trade 2019). Commerce issued its remand redetermination, recalculating Trina's export price in accordance with *Trina I,* under protest. J.A. 6764–65; *see* J.A. 6764–70 (Remand Redetermination). The CIT sustained Commerce's Remand Redetermination. *See Changzhou Trina Solar Energy Co. v. United States* (*Trina II*), 393 F. Supp. 3d 1245, 1251 (Ct. Int'l Trade 2019); J.A. 16–17 (Judgment).

SolarWorld appeals. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5). We affirm.

BACKGROUND

I. Legal Framework

Antidumping duties may be imposed on "foreign merchandise [that] is being, or is likely to be, sold in the United States at less than its fair value." 19 U.S.C. § 1673(1). Domestic industries may seek "relief from [such] imports," *Allegheny Ludlum Corp. v. United States*, 287 F.3d 1365, 1368 (Fed. Cir. 2002), by filing a petition with Commerce and the U.S. International Trade Commission ("ITC") to initiate an antidumping duty investigation, *see* 19 U.S.C. §§ 1673a(b), 1677(9)(C). Following investigation, if Commerce determines that imported merchandise "is being, or is likely to be, sold in the United States at less than its fair value," *id.* § 1673(1), and the ITC determines that the importation or sale of that merchandise has "materially injured" or "threaten[s]" to "materially injur[e]" "an industry in the United States," *id.* § 1673(2), then Commerce will "publish an antidumping duty order . . . direct[ing] [U.S. Customs and Border Protection] to assess . . . antidumping dut[ies]" on subject merchandise, *id.* § 1673e(a)(1). Each year after the order is published, "if [Commerce receives] a request for . . . review" of that order from an interested party, Commerce will "review[] and determine . . . the amount of any antidumping duty" under the order. *Id.*

§ 1675(a)(1)(B) (providing for the "[p]eriodic review of [the] amount of duty"); *see* 19 C.F.R. § 351.213(b) (providing for the "[a]dministrative review of orders" on the request of "an interested party").[1]

In the course an investigation or review, Commerce "determine[s] the estimated weighted average dumping margin for each exporter and producer individually investigated" or reviewed and "the estimated all-others rate for all exporters and producers not individually investigated" or reviewed.  19 U.S.C. § 1673d(c)(1)(B)(i); *see id.* § 1677f-1(c) (providing for the "[d]etermination of dumping margin[s]" in investigations and reviews for "a reasonable number of exporters or producers").  A dumping margin reflects the amount by which the "'normal value' (the price a producer charges in its home market) exceeds the 'export price' (the price of the product in the United States) or 'constructed export price.'"  *U.S. Steel Corp. v. United States*, 621 F.3d 1351, 1353 (Fed. Cir. 2010) (footnote omitted) (citing 19 U.S.C. § 1677(35)(A)); *see* 19 U.S.C. §§ 1677b(a)(1) (defining "normal value" as "the price at which the [merchandise] is first sold . . . for consumption" in the home country or a third country), 1677a(b) (defining "constructed export price" as "the price at which the subject merchandise is first sold . . . in the United States" to "a purchaser not affiliated with the producer or exporter").  Where merchandise is subject to both antidumping and countervailing duties ("countervailing duties" or "CVD"), Commerce will increase the export price or constructed export price by "the

---

[1]    An "interested party" includes: "a foreign manufacturer, producer, or exporter, or the United States importer, of subject merchandise"; "the government of a country in which such merchandise is produced or manufactured or from which such merchandise is exported"; and, "a manufacturer, producer, or wholesaler in the United States of a domestic like product."  19 U.S.C. § 1677(9)(A)–(C).

amount of any countervailing duty imposed on the subject merchandise . . . to offset an export subsidy[.]" 19 U.S.C. § 1677a(c)(1)(C); *see id.* § 1671(a)(1) (providing that countervailing duties may be imposed on imported merchandise to countervail subsidies provided by, e.g., the government of the exporting country, for "the manufacture, production, or export of" that merchandise). If Commerce finds that the exporting country is a "nonmarket economy" ("NME") country[2] and "that available information does not permit the normal value of the subject merchandise to be determined under [§ 1677b(a)]," then Commerce calculates the normal value using surrogate values for the "factors of production" in a comparable "market economy country." *Id.* § 1677b(c)(1).

## II. Procedural History

### A. The AD and CVD Orders

In December 2013, SolarWorld, "a domestic producer of solar cells and panels," filed "antidumping [and counter-vailing] duty . . . petition[s] concerning imports of certain crystalline silicon photovoltaic products" from the PRC, then Commerce initiated antidumping and countervailing duty investigations in response. *Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China and Taiwan*, 79 Fed. Reg. 4,661, 4,661 (Dep't of Commerce Jan. 29, 2014) (initiation of antidumping duty

---

[2]    An NME country is "any foreign country that [Commerce] determines does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise." 19 U.S.C. § 1677(18)(A). Commerce considers the PRC to be an NME country. *Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China*, 82 Fed. Reg. 12,793, 12,795 (Dep't of Commerce Mar. 7, 2017) (preliminary results) ("*Preliminary Results*").

investigations); *see Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China*, 79 Fed. Reg. 4,667, 4,668 (Dep't of Commerce Jan. 29, 2014) (initiation of countervailing duty investigation) (similar). Trina was a mandatory respondent in the CVD investigation proceedings. *See Countervailing Duty Investigation of Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China*, 79 Fed. Reg. 76,962, 76,963 (Dep't of Commerce Dec. 23, 2014) (final affirmative countervailing duty determination) ("*Final CVD Determination*").

In calculating Trina's countervailing duty rate, Commerce found various "[p]rograms . . . to be countervailable," Issues & Decisions Mem., *Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China*, C-570-011, Investigation at 16 (Dec. 15, 2014), https://enforcement.trade.gov/frn/summary/prc/2014-30071-1.pdf (adopted in *Final CVD Determination*, 79 Fed. Reg. 76,962) ("Final CVD I&D Mem."), among them, "Export Buyer's Credits," as "[e]xport [c]redit [s]ubsidies" ("Ex-Im Bank Buyer's Credit Program") provided by the Export-Import Bank of China ("Ex-Im Bank"), *id.* at 30. Commerce explained that, "through this program, the [Ex-Im Bank] provides loans at preferential rates for the purchase of exported goods from the PRC." *Id.*; *see id.* at 94 ("[W]here we have found that such export buyer's credits have been used [by buyers], we have consistently found such financing to be countervailable as a subsidy benefitting the exporter"). While Trina had reported that it had not used the Ex-Im Bank Buyer's Credit Program, *see id.* at 94, Commerce "was not able to verify [Trina's] reported non-use . . . during verification with the [Government of China]," *id.* at 30. Commerce, accordingly, "rel[ied] upon [adverse facts available ('AFA')]" to determine that "Trina . . . used [the] program during the [period of investigation]." *Id.*; *see* 19 U.S.C. §§ 1677e(a)(2)(A) (providing for "[d]eterminations [made] on [the] basis of facts available" where an "interested party . . . withholds [requested] information"),

1677e(b)(1) (providing for the use of "[a]dverse inferences" "in selecting from among the facts otherwise available" where Commerce "finds that an interested party has failed to cooperate . . . to the best of its ability"). Commerce concluded that Trina had "benefited from this program at [a] rate of 10.54 percent *ad valorem*, the highest rate determined for a similar program in a prior PRC proceeding." Final CVD I&D Mem. 16.

In February 2015, Commerce issued antidumping and countervailing duty orders covering "certain crystalline silicon photovoltaic products," specifically, "modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including building integrated materials." *Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China*, 80 Fed. Reg. 8,592, 8,592 (Dep't of Commerce Feb. 18, 2015) (antidumping duty order and amended final affirmative countervailing duty determination and countervailing duty order) ("*AD and CVD Orders*").[3]

---

[3]     The *AD and CVD Orders* discussed here are distinct from and in addition to the 2012 AD and CVD orders on "crystalline silicon photovoltaic cells, whether or not assembled into modules, laminates, and/or panels, from the PRC." *AD and CVD Orders*, 80 Fed. Reg. at 8,593 (footnote omitted); *see Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China,* 77 Fed. Reg. 73,018 (Dep't of Commerce Dec. 7, 2012) (amended final determination of sales at less than fair value, and antidumping duty order); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 77 Fed. Reg. 73,017 (Dep't of Commerce Dec. 7, 2012) (countervailing duty order).

## B. The First Administrative Review

In February 2016, Commerce filed notice of the opportunity to request administrative review of the *AD and CVD Orders*. *Opportunity to Request Administrative Review*, 81 Fed. Reg. 5,712, 5,713 (Dep't of Commerce Feb. 3, 2016); *see* 19 U.S.C. § 1675(a)(1); 19 C.F.R. § 351.213. Commerce received multiple requests for review. J.A. 6562 (Preliminary I&D Mem.). Commerce initiated the *AD Order*'s first administrative review, covering the period of review of July 31, 2014, through January 31, 2016. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 81 Fed. Reg. 20,324, 20,324 (Dep't of Commerce Apr. 7, 2016). Commerce selected Trina as the sole mandatory respondent. J.A. 6562. Having been the petitioner in the original AD and CVD investigations, SolarWorld participated as an interested party. J.A. 6563.

In March 2017, Commerce issued its preliminary results. *See Preliminary Results*, 82 Fed. Reg. at 12,794; *see* J.A. 6561–87 (Preliminary I&D Mem.). Commerce declined to increase Trina's export price "by the amount of any countervailing duty imposed to offset an export subsidy." J.A. 6586. Commerce explained that, "[a]s a result of noncooperation by the Government of China in the companion CVD investigation," Commerce had relied on AFA to "determine[] that Trina benefited from the Export Buyer's Credits Program," and, as such, "did not determine" whether "the program in question was export contingent." J.A. 6586. "Without a determination in the companion CVD investigation that this program provides an export subsidy," Commerce concluded it was inappropriate to offset Trina's export price by the amount of the countervailing duty imposed. J.A. 6586. Further, because "[Commerce] considers the PRC to be an NME country," J.A. 6567, Commerce selected Thailand as a surrogate market economy country to provide surrogate values to calculate Trina's normal value, J.A. 6575; *see also* 19 U.S.C. § 1677b(c)(1) (providing for the use of surrogate values to

calculate normal value for NME respondents). Commerce valued Trina's module glass input using Harmonized Tariff Schedule ("HTS") Subheading 7007.19.90000 (covering "Toughened (Tempered) Safety Glass, Not Suitable For Incorporation In Vehicles, Aircraft, Spacecraft Or Vessels; Other"). J.A. 140 (Final I&D Mem.).

In July 2017, Commerce issued its *Final Results*. 82 Fed. Reg. at 32,170; *see* J.A. 113–56 (Final I&D Mem.). Commerce calculated a 9.61 percent weighted average dumping margin for Trina. *Final Results*, 82 Fed. Reg. at 32,171. Consistent with the *Preliminary Results*, Commerce declined to offset Trina's export price by any countervailed export subsidy. J.A. 121. Commerce explained that it "did not make a determination in the [companion] CVD investigation . . . that the [Ex-Im Bank] Buyer's Credit Program was an export subsidy," because it had relied on AFA to countervail the program. J.A. 121. For Trina's normal value, Commerce "continued to value Trina's module glass using Thai imports of tempered glass classified under HTS [Subheading] 7007.19.90000[.]" J.A. 141. Commerce rejected SolarWorld's argument that "Trina's module glass should be valued using HTS [Subheading] 7007.29.90 (i.e., Laminated safety glass: Other; Other)," because "laminated glass is 'made in sandwich form, with one or more interlayers of plastics between two or more sheets of glass,'" J.A. 141 (quoting WCO EN 7007.29.90), and there was "no record evidence of additional working [of Trina's module glass] that would result in glass comparable to laminated glass," J.A. 142.

Both SolarWorld and Trina filed suit against the Government in the CIT, challenging Commerce's *Final Results* as unsupported by substantial evidence and contrary to law. *Trina I*, 359 F. Supp. 3d at 1331. On the offset issue, the CIT remanded to Commerce, concluding that "Commerce's decision to not offset the Ex-Im Bank Buyer's Credit Program [wa]s contrary to law[.]" *Id*. at 1332. The CIT reasoned that, because AFA "does not obviate the need

10        CHANGZHOU TRINA SOLAR ENERGY v. UNITED STATES

for Commerce to affirmatively find that the elements of the statute have been satisfied," Commerce must have "necessarily found that the [Ex-Im Bank] [B]uyer's [C]redit [P]rogram was an export subsidy," and, therefore, "Commerce's decision to deny an offset for the countervailing duties imposed" as a result of the Ex-Im Bank Buyer's Credit Program "is contrary to law[.]" *Id.* at 1339. The CIT "directed [Commerce] to recalculate Trina's [export] prices to account for the offset[.]" *Id.* at 1332. On the valuation of Trina's inputs, the CIT "sustain[ed] Commerce's selection of surrogate values for," inter alia, "module glass" as supported by substantial evidence. *Id.* The CIT explained that "Commerce [had] reasonably determined that [Thai] import data under HTS [S]ubheading 7007.19.90000 constitute[d] the best available information with which to value [that] input." *Id.* at 1336; *see* 19 U.S.C. § 1677b(c)(1) (providing that Commerce's surrogate value determinations must "be based on the best available information regarding the values of [relevant] factors in a market economy country or countries").

"In accordance with [*Trina I*]," Commerce, "under respectful protest, increased Trina's [export] price[] by the amount countervailed" based on the Ex-Im Bank Buyer's Credit Program subsidy "in the most recently completed segment of the corresponding [CVD] proceeding." J.A. 6764–65 (citing *Final CVD Determination*, 79 Fed. Reg. 76,962); *see Viraj Grp., Ltd. v. United States*, 343 F.3d 1371, 1376 (Fed. Cir. 2003) (explaining that Commerce may "adopt[] under protest a contrary position forced upon it by the [CIT]" and subsequently appeal that position to this court). Commerce maintained that, while it had "properly determined not to grant Trina an offset to its [export] prices for the countervailed . . . Ex-Im Bank Buyer's Credit Program," it nonetheless "compl[ied] with the [CIT's] direction" and "increased Trina's [export] price[.]" J.A. 6769. As a result, Trina's weighted average dumping margin was reduced to 3.42 percent. J.A. 6770. The CIT

sustained Commerce's Remand Redetermination.    *See Trina II*, 393 F. Supp. 3d at 1251.

### DISCUSSION

SolarWorld argues that: (1) the CIT "erred in sustaining Commerce's [Remand Redetermination]—made under protest—to offset Trina's [export] price to account for the countervailed" Ex-Im Bank Buyer's Credit Program, Appellant's Br. 19 (capitalization normalized); and (2) the CIT "improperly deferred" to Commerce when it "sustain[ed] Commerce's decision to apply Thai HTS [Subheading] 7007.19.90000 to Trina's solar [module] glass," *id.* at 31. We address each argument in turn.

### I. Standard of Review

We "apply . . . the same standard" of review as the CIT, *Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1373 (Fed. Cir. 2015) (internal quotation marks and citation omitted), upholding Commerce's determinations if they are supported "by substantial evidence on the record" and otherwise "in accordance with law," 19 U.S.C. § 1516a(b)(1)(B)(i).  "Although we review the decisions of the CIT de novo, we give great weight to the informed opinion of the CIT and it is nearly always the starting point of our analysis." *Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1341 (Fed. Cir. 2016) (internal quotation marks, alterations, and citation omitted).

We review Commerce's "statutory interpretations as to the appropriate methodology" under *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,* 467 U.S. 837 (1984).  *Pesquera Mares Australes Ltda. v. United States*, 266 F.3d 1372, 1379 (Fed. Cir. 2001).  If "Congress has directly spoken to the precise question at issue," then "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Wheatland Tube Co. v. United States,* 495 F.3d 1355, 1359 (Fed. Cir. 2007) (quoting *Chevron,* 467 U.S. at 842–43).  "In

order to determine whether a statute clearly shows the intent of Congress . . . , we employ traditional tools of statutory construction and examine the statute's text, structure, and legislative history, and apply the relevant canons of interpretation." *Kyocera Solar, Inc. v. U.S. Int'l Trade Comm'n*, 844 F.3d 1334, 1338 (Fed. Cir. 2016) (internal quotation marks and citations omitted). If, however, "the statute is silent or ambiguous with respect to the specific issue," we evaluate whether Commerce's interpretation is reasonable. *Chevron*, 467 U.S. at 843. The agency's construction need not be the only reasonable interpretation or even the most reasonable interpretation. *See Zenith Radio Corp. v. United States*, 437 U.S. 443, 450 (1978).

We review Commerce's findings of fact for substantial evidence. *See SolarWorld Ams., Inc. v. United States*, 910 F.3d 1216, 1222 (Fed. Cir. 2018). Substantial evidence is "more than a mere scintilla"; rather it is such "evidence that a reasonable mind might accept as adequate to support a conclusion." *Downhole Pipe*, 776 F.3d at 1374 (internal quotation marks and citations omitted). "We look to the record as a whole, including evidence that supports as well as evidence that fairly detracts from the substantiality of the evidence." *SolarWorld*, 910 F.3d at 1222 (internal quotation marks and citation omitted).

## II. Export Subsidy Offset

### A. Legal Standard

If imported merchandise is subject to both antidumping and countervailing duties, Commerce "shall," when calculating a respondent's antidumping duty rate, "increase[]" the respondent's "export price" or "constructed export price" by "the amount of any countervailing duty imposed . . . to offset an export subsidy[.]" 19 U.S.C. § 1677a(c)(1)(C). Commerce may impose countervailing duties when it "determines that the government of a country or any public entity within the territory of a country is providing, directly or indirectly, a countervailable subsidy"

for "the manufacture, production, or export of" the subject merchandise. *Id.* § 1671(a)(1); *see id.* § 1677(5) (providing that a "countervailable subsidy" is a "financial contribution," "income or price support," or "funding mechanism" provided by "an authority," such as a government, "to a person" with "a benefit . . . thereby conferred"). To be countervailable, a subsidy must be "specific." *Id.* § 1677(5)(A). To be "specific" a subsidy must be "an export subsidy," "an import substitution subsidy," or one of certain "domestic subsid[ies]." *Id.* § 1677(5A)(A). "An export subsidy is a subsidy that is, in law or in fact, contingent upon export performance, alone or as [one] of [two] or more conditions." *Id.* § 1677(5A)(B); *see* 19 C.F.R. § 351.514(a) (explaining that "a subsidy" is "contingent upon export performance if the provision of the subsidy is, in law or in fact, tied to actual or anticipated exportation or export earnings, alone or as one of two or more conditions").

If Commerce finds, in the course of an investigation or review, that "necessary information is not available on the record" or "an interested party or any other person . . . withholds information that has been requested by [Commerce]," "fails to provide such information by the deadlines . . . or in the form and manner requested," "significantly impedes a proceeding," or "provides such information but the information cannot be verified," then Commerce is permitted to use "facts otherwise available" in making its determinations. 19 U.S.C. § 1677e(a)(2)(A)– (D); *see* 19 C.F.R. § 351.308 (providing for "[d]eterminations on the basis of facts available"). If Commerce further finds a respondent has "failed to cooperate by not acting to the best of its ability to comply with a request for information," then it "may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available" (that is, AFA). 19 U.S.C. § 1677e(b); *see* 19 C.F.R. § 351.308(a) (similar). In selecting AFA, Commerce may use information from the petition, investigation, prior administrative reviews, or "any other

information placed on the record." 19 U.S.C. § 1677e(b); *see id.* § 1677e(b)(2) (providing a list of "[p]otential sources of information for adverse inferences"); 19 C.F.R. § 351.308(c) (similar); *Gallant Ocean (Thail.) Co. v. United States*, 602 F.3d 1319, 1323 (Fed. Cir. 2010) (providing that, "in the case of uncooperative respondents," Commerce has discretion to "select from a list of secondary sources as a basis for its adverse inferences"). When Commerce "relies on secondary information rather than on information obtained in the course of an investigation or review," it "shall, to the extent practicable, corroborate that information from independent sources that are reasonably at [its] disposal." 19 U.S.C. § 1677e(c); *see* 19 C.F.R. § 351.308(d) (providing for the "[c]orroboration of secondary information" "to the extent practicable" and providing a non-exclusive list of "independent sources that are reasonably at [Commerce's] disposal").

## B. Commerce's Decision to Not Offset Trina's Export Price Is Contrary to Law

In its *Final Results*, Commerce declined to increase Trina's export price by the amount countervailed to offset the Ex-Im Bank Buyer Credit Program. J.A. 121. Commerce explained that such an increase was improper because Commerce "did not make a determination in the [companion] CVD investigation . . . that the [Ex-Im Bank] Buyer's Credit Program was an export subsidy" because it had relied on AFA to countervail the program. J.A. 121. The CIT remanded to Commerce, concluding that "Commerce's refusal to offset the CVDs imposed is contrary to law because Commerce necessarily determined that the [Ex-Im Bank] [B]uyer's [C]redit [P]rogram was an export subsidy in the [companion] CVD investigation." *Trina I*, 359 F. Supp. 3d at 1337. The CIT "directed [Commerce] to recalculate Trina's [export] prices to account for the offset[.]" *Id.* at 1332. On remand, Commerce, "under respectful protest, increased Trina's [export] price[] by the amount countervailed" as a result of the Ex-Im Bank Buyer's Credit

Program. J.A. 6764–65. The CIT sustained Commerce's Remand Redetermination. *Trina II*, 393 F. Supp. 3d at 1251. SolarWorld asserts that "[t]he CIT erred in ordering Commerce to offset Trina's [export] price to account for the countervailed Ex-Im [Bank] Buyer's Credit Program," Appellant's Br. 17, and in "sustaining Commerce's decision [as] made under protest," *id.* at 19.[4] We disagree with SolarWorld.

Commerce's decision to not increase Trina's export price by the amount countervailed for the Ex-Im Bank Buyer's Credit Program is contrary to law. Where, as here, merchandise is subject to both antidumping and countervailing duties during the period of review, Commerce "shall," when calculating a respondent's antidumping duty rate, "increase[]" the respondent's "export price" or "constructed export price" by "the amount of any countervailing duty imposed . . . to offset an export subsidy[.]" 19 U.S.C. § 1677a(c)(1)(C); *see AD and CVD Orders*, 80 Fed. Reg. at 8,592 (providing that Trina's merchandise is subject to antidumping and countervailing duties). As such, when calculating Trina's antidumping duty rate, Commerce was required to increase Trina's export price by any countervailing duty imposed in the companion CVD investigation to offset an export subsidy. *See Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach,* 523 U.S. 26, 35 (1998) (explaining that "shall" generally creates "an obligation impervious to judicial discretion" (citing *Anderson v. Yungkau*, 329 U.S. 482, 485 (1947))).

---

[4]     While Commerce issued its Remand Redetermination under respectful protest, J.A. 6764–70; *see Viraj*, 343 F.3d at 1376 (providing that the Government may appeal Commerce's determinations made under protest), the Government does "not appeal" the CIT's reversal of this policy and "do[es] not address the issue substantively in [its] brief," Gov't's Br. 7 n.1.

Here, Commerce failed to increase Trina's export price by a countervailing duty imposed to offset an export subsidy. In the companion CVD investigation, Commerce first determined that the Ex-Im Bank Buyer's Credit Program was countervailable as an export subsidy. Commerce described the program as providing "[e]xport [c]redit [s]ubsidies," explaining that "[t]hrough th[e] program, the [Ex-Im Bank] provides loans at preferential rates for the purchase of exported goods from the PRC." Final CVD I&D Mem. 30; *see* 19 U.S.C. § 1677(5A)(B) ("An export subsidy is a subsidy that is, in law or in fact, contingent upon export performance, alone or as [one] of [two] or more conditions."). Next, "[un]able to verify [Trina's] reported non-use of [the program]," Commerce resorted to AFA to determine that Trina had "used [the] program during the [period of investigation]." Final CVD I&D Mem. 30. Commerce, accordingly, imposed a countervailing duty on Trina's merchandise to offset the Ex-Im Bank Buyer's Credit Program. *See id.* at 16. Having determined that the Ex-Im Bank Buyer's Credit Program was an export subsidy and imposed a countervailing duty on Trina's merchandise as a result, Commerce was required to increase Trina's export price by the offset. Commerce's decision to do otherwise was contrary to law. *See* 19 U.S.C. § 1677a(c)(1)(C) (providing that a respondent's "export price shall be[] increased by . . . the amount of any countervailing duty imposed on the subject merchandise . . . to offset an export subsidy"); *Kyocera Solar*, 844 F.3d at 1338 (explaining that, where "'Congress has directly spoken to the precise question at issue[,]' . . . our inquiry ends, for we 'give effect to the unambiguously expressed intent of Congress.'" (quoting *Chevron*, 467 U.S. at 842–43)).

Commerce's reasoning that, because its "determination to countervail the [Ex-Im Bank Buyer's Credit Program] was based on [AFA]," it "[had] not" actually "ma[d]e a determination that the program . . . was [an export subsidy]" and, therefore, was not required to offset it, J.A. 121–22, is

incorrect.  AFA allows Commerce to "reach[]" a "determi-
nation" on an incomplete record.  19 U.S.C. § 1677e(a); *see
id.* § 1677e(b)(2) (providing "[p]otential sources of infor-
mation for adverse inferences").  It does not obviate Com-
merce's obligation to make "the applicable determination."
*Id.* § 1677e(a); *see id.* § 1671(a)(1) (providing that Com-
merce must "determine[] that" an exporter or producer is
receiving "a countervailable subsidy" before imposing coun-
tervailing duties).  Nor does it obviate Commerce's obliga-
tion to support any such determinations "[with] substantial
evidence."  *Id.* § 1516a(b)(1)(B)(i); *see id.* § 1677e(c) (requir-
ing that Commerce, "to the extent practicable, corroborate
that information from independent sources that are rea-
sonably at their disposal"); *Gallant Ocean*, 602 F.3d at 1325
(vacating and remanding Commerce's AFA duty rate cal-
culation as unsupported by substantial evidence);
*Dongguan Sunrise Furniture Co. v. United States*, 931 F.
Supp. 2d 1346, 1350 (Ct. Int'l Trade 2013) ("[E]ven an AFA
rate must be supported by substantial evidence." (citation
omitted)).  Before imposing a countervailing duty, Com-
merce must necessarily determine that a subsidy is "spe-
cific"—that it is an "export subsidy," "import substitution
subsidy," or a "[d]omestic subsidy" meeting certain require-
ments, 19 U.S.C. § 1677(5A)—even if it must use AFA to do
so, *id.* § 1677e (providing that Commerce may "use the
facts otherwise available in reaching the applicable deter-
mination").  Otherwise, Commerce cannot impose a coun-
tervailing duty to offset that subsidy.  *Id.* §§ 1671(a)(1)
(providing that Commerce may impose countervailing du-
ties only where it "determines that the government of a
country or any public entity within the territory of a coun-
try is providing, directly or indirectly, a countervailable
subsidy"), 1677(5)(A) (providing that, to be countervailable,
a subsidy must be "specific").  Accordingly, Commerce's de-
cision to not offset Trina's export price, based on its reli-
ance on AFA to countervail the Ex-Im Bank Buyer's Credit
Program, is contrary to law.

SolarWorld's counterarguments are unpersuasive. First, SolarWorld argues that, because the term "export subsidy" in 19 U.S.C. § 1677a(c)(1)(C) is ambiguous, the CIT should have deferred to Commerce's reasonable interpretation of that term—that "export subsidy . . . exclude[s] AFA determinations[.]" Appellant's Br. 26 (capitalization normalized). This argument is without merit. The term "export subsidy" is not ambiguous as to whether it includes determinations made using AFA. On its face, it covers all export subsidy determinations. *See* 19 U.S.C. § 1677(5A)(B) (defining "export subsidy" as "a subsidy that is, in law or in fact, contingent upon export performance, alone or as [one] of [two] or more conditions"). Moreover, Commerce did not offer an interpretation of "export subsidy" in either its *Final Results*, *see* J.A. 121–22, or its Remand Redetermination, *see* J.A. 6764–70. Commerce concluded only that, by resorting to AFA, it "[had] not determine[d]" whether "the subsidies in question were export subsidies" within the statutory definition and "as required for an offset under [19 U.S.C. § 1677a(c)(1)(C)]." J.A. 121–22; *see* J.A. 122 n.16 (quoting 19 U.S.C. § 1677(5A)(B) without comment). At best, SolarWorld's argued interpretation of "export subsidy" comes from the Government's briefing before the CIT. *See* Def.'s Resp. Br. Opp'n Rule 56.2 Mots. J. Agency R. at 23–25, *Changzhou Trina Solar Energy Co. v. United States*, CIT Consol. No. 17-cv-00199-CRK (June 7, 2018), ECF No. 38 (arguing that, because the term "export subsidy" is ambiguous and "does not require that Trina's [export] price be adjusted," Commerce's "interpretation" of 19 U.S.C. § 1677a(c)(1)(C) should be deferred to as "reasonable"). Even if the term "export subsidy" were ambiguous, *see* 19 U.S.C. § 1677(5A)(B) (expressly defining "export subsidy"), we do not apply *Chevron* "to an agency counsel's interpretation of a statute," much less a defendant-intervenor's, "where the agency itself has articulated no position on the question," *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212 (1988).

Second, SolarWorld argues that we should give *Auer* deference to Commerce's interpretation of the Final CVD I&D Mem.—erroneously calling it the "CVD Order"—as "apply[ing] AFA in finding the Ex-Im [Bank] Buyer's Credit Program was an export subsidy." Appellant's Br. 20 (citing *Auer v. Robbins*, 519 U.S. 452, 461 (1997); *Diamond Sawblades Mfrs. Coal. v. Hyosung D&P Co.*, 809 F.3d 626, 630 (Fed Cir. 2015)).  This argument is irrelevant.  Here, as SolarWorld concedes, Commerce has determined that the Ex-Im Bank Buyer's Credit Program was an "[e]xport[] . . . [s]ubsid[y]," because it "provides loans at preferential rates for the purchase of exported goods from the PRC."  Final CVD I&D Mem. 30; *see* Appellant's Br. 20 (arguing that Commerce "f[ound] the Ex-Im [Bank] Buyer's Credit Program was an export subsidy" (capitalization normalized)).  As discussed above, whether Commerce used AFA to reach that determination is immaterial.  *See* 19 U.S.C. §§ 1671(a)(1), 1677a(c)(1)(C), 1677e(a).

Third, SolarWorld argues that "providing . . . an offset would inappropriately reward noncompliance with Commerce's request for information[]" from the Government of China in the CVD investigation, "eliminating any incentive for the [Government of China] to cooperate in future CVD investigations of this key subsidy program."  Appellant's Br. 18.  SolarWorld neglects the fact that AFA was already applied to increase Trina's countervailing duty rate.  *See* Final CVD I&D Mem. 16, 94; *see also Dupont Teijin Films USA, LP v. United States*, 273 F. Supp. 2d 1347, 1349 n.4 (2003) (explaining that "[t]he basic economic theory behind [19 U.S.C. § 1677a(c)(1)(C)]" is that the any "export subsidy" received directly "contribute[s] to lower-priced sales of subject merchandise . . . by the amount of [that] subsidy. The offset is designed to prevent the double application of duties when the subsidies and dumping are related.").  Further, SolarWorld's argument misapprehends the nature of AFA.  *See F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000)

(explaining that AFA "is to provide respondents with an incentive to cooperate, not to impose punitive, aberrational, or uncorroborated margins"). Accordingly, Commerce's decision to not offset Trina's export price is contrary to law. *See Wheatland Tube,* 495 F.3d at 1359 ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." (quoting *Chevron,* 467 U.S. at 842–43)).

## III. Surrogate Value Selection

### A. Legal Standard

Where, as here, the exporting country has a non-market economy, *see Preliminary Results*, 82 Fed. Reg. at 12,795, Commerce calculates the normal value for a respondent's subject merchandise using surrogate values from a comparable market economy country, *see* 19 U.S.C. § 1677b(c)(1), (4). In selecting surrogate values, Commerce "attempts to construct a hypothetical market value of [the subject merchandise] in the [NME]." *Downhole Pipe,* 776 F.3d at 1375 (internal quotation marks, alterations, and citation omitted).

Commerce's surrogate value determinations must "be based on the best available information regarding the values of [relevant] factors in a market economy country or countries." 19 U.S.C. § 1677b(c)(1); *see id.* § 1677b(a) (providing that Commerce constructs the "normal value" "to achieve a fair comparison with the export price"). "Commerce has broad discretion to determine" what constitutes "the best available information," as this term "is not defined by statute." *QVD Food Co. v. United States,* 658 F.3d 1318, 1323 (Fed. Cir. 2011). Commerce "generally selects, to the extent practicable, surrogate values that are publicly available, are product-specific, reflect a broad market average, and are contemporaneous with the period of review." *Qingdao Sea–Line Trading Co. v. United States,* 766 F.3d 1378, 1386 (Fed. Cir. 2014) (footnote omitted).

### B. Commerce's Surrogate Value Selection for Trina's Module Glass Is Supported by Substantial Evidence

In its *Final Results*, Commerce "value[d] Trina's module glass using Thai imports of tempered glass classified under HTS [Subheading] 7007.19.90000," J.A. 141; *see* J.A. 140 (providing that Thai HTS Subheading 7007.19.90000 "Toughened (Tempered) Safety Glass, Not Suitable For Incorporation In Vehicles, Aircraft, Spacecraft Or Vessels; Other"). Specifically, Commerce found, based on "an examination of record information and Trina's [submissions]" in the course of administrative review, that "Trina's module glass" was "tempered." J.A. 141. Presented with Thai import data for HTS Subheading 7007.19.90000 ("tempered/safety glass"), HTS Subheading 7007.19.90001 ("float glass"), and HTS Subheading 7007.29.90 ("laminated safety glass"), Commerce concluded that "Trina's module glass [wa]s appropriately valued using Thai HTS [Subheading] 7007.19.90000." J.A. 141. The CIT sustained this determination as supported by substantial evidence. *See Trina I*, 359 F. Supp. 3d at 1336. SolarWorld argues that "Commerce's determination to use Thai HTS [Subheading] 7007.19.90000 to value Trina's solar glass was not supported by substantial evidence." Appellant's Br. 31 (capitalization normalized). SolarWorld asserts that "[r]ecord evidence . . . makes clear that[,] in addition to being tempered, Trina's solar module glass also undergoes additional processing" that "impart[s] extreme durability to the glass," leaving "Thai HTS [Subheading] 7007.29.90 . . . the only HTS number that reflects" that processing. *Id.* at 34–35; *see* J.A. 141 (providing that HTS Subheading 7007.29.90 covers "Laminated safety glass: Other; Other"). We disagree with SolarWorld.

Substantial evidence supports Commerce's decision to value Trina's module glass using Thai imports of tempered glass classified under HTS Subheading 7007.19.90000. In its submissions to Commerce, Trina described its module glass as "tempered." J.A. 46–47 (Trina's Third

Supplemental Questionnaire Response) (providing that "both [its] coated glass and tempered glass" are "tempered"); *see* J.A. 5550 (Trina's Section A Questionnaire Response) (providing Trina advertising material describing Trina's module glass as "[anti-reflective] coated tempered glass"), 5713 (Trina's First Supplemental Questionnaire Response) (explaining that Trina's "tempered glass" is "float glass" rather than "rolled glass"). Further, Commerce, examining Trina's publicly available data, found that the "only glass referred to there [was] tempered glass." J.A. 46. Examination of other producers' publicly available data indicated use of "tempered glass" with "antireflection surface treatment" and "extremely durable" "front glazing," in some cases "us[ing] a polymer film (plastic) as the front sheet." J.A. 46–47. Trina confirmed that there was no "significant difference between the glass referred to in" the publicly available information and "the glass Trina consumed during the [period of review] to produce the subject merchandise." J.A. 47. On this basis, Commerce conclude that "Trina's module glass [wa]s appropriately valued" using data for "Thai imports of tempered glass classified under HTS [Subheading] 7007.19.90000." J.A. 141; *see Qingdao Sea–Line*, 766 F.3d at 1386 (providing that "Commerce generally selects, to the extent practicable, surrogate values that are," inter alia, "product-specific"). As such, Commerce's use of Thai tempered glass data to value Trina's tempered module glass is supported by substantial evidence. *See Downhole Pipe*, 776 F.3d at 1374 (providing that substantial evidence is such evidence as a "reasonable mind might accept as adequate to support a conclusion" (citing *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).

SolarWorld's counterarguments are unpersuasive. First, SolarWorld argues that "Commerce failed to use the 'best available information' to value Trina's solar glass," because "Commerce valued Trina's coated, tempered glass using Thai imports of standard tempered glass[.]"

Appellant's Br. 31 (emphasis omitted).  This argument misapprehends the "best available evidence" standard.  "The data on which Commerce relies to value inputs must be the 'best available information,' but there is no requirement that the data be perfect."  *Home Meridian Int'l, Inc. v. United States*, 772 F.3d 1289, 1296 (Fed. Cir. 2014).  The fact that Trina's tempered glass has a coating does not preclude the conclusion that Thai import data for tempered glass is the best available information on the record to value it.  *See Nation Ford Chem. Co. v. United States*, 166 F.3d 1373, 1377 (Fed. Cir. 1999) ("The 'best available information' . . . may constitute information from the surrogate country that is directly analogous to the production experience of the NME producer . . . or it may not."); *see also SolarWorld*, 910 F.3d at 1223 (explaining that, in selecting surrogate values, "Commerce is not required to engage in a classification analysis but instead is required to determine which of the competing subheadings constituted the best available information" (internal quotation marks and citation omitted)).

Second, SolarWorld argues that, "[b]ecause Commerce did not consider evidence that detracts from its conclusion," specifically, "[record] evidence indicating that Trina's glass [is laminated glass]," Commerce's decision is "not supported by substantial evidence."  Appellant's Br. 35.  This argument is premised on a misreading of Commerce's determination.  Commerce "disagree[d] with [SolarWorld's] suggestion that Trina's module glass should be valued" as "[l]aminated safety glass" using Thai "HTS [Subheading] 7007.29.90[.]"  J.A. 141.  Commerce explained that, while "laminated glass is 'made in sandwich form, with one or more interlayers of plastics between two or more sheets of glass,'" J.A. 141 (quoting WCO EN 7007.29.90), SolarWorld could only point to evidence that "Trina's module glass" had potentially "undergone additional working such as surface treatments and glazing," not "additional working that would result in . . . laminated glass . . . made of multiple

layers of plastic and glass," J.A. 142. On appeal, Solar-World does not challenge Commerce's definition of laminated glass or point to missed evidence; rather, SolarWorld proffers the same rejected evidence, *compare* Appellant's Br. 33–34 (arguing that a "datasheet for glass on Trina's website refers to . . . ['c]oated [t]empered [g]ass'" with "'a polymer film (plastic) as the front sheet . . . for arrays in high-impact environments'" and "information from other module suppliers, indicating that their glass is 'high-transparency tempered glass with an antireflection surface treatment'" and "'front glazing . . . [that] is extremely durable'" (quoting J.A. 46–47 (Trina's Third Supplemental Questionnaire Response)), *with* J.A. 140–42 (summarizing SolarWorld's arguments before Commerce as relying on the same evidence), and "invite[s] [us] to reweigh [it]," *Downhole Pipe*, 776 F.3d at 1376. We decline to do so. *See Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 936 (Fed. Cir. 1984) ("That [an appellant] can point to evidence of record which detracts from the evidence which supports the [agency's] decision and can hypothesize a reasonable basis for a contrary determination is neither surprising nor persuasive."). Accordingly, substantial evidence supports Commerce's decision to value Trina's module glass using Thai imports of tempered glass classified under HTS Subheading 7007.19.90000.

## CONCLUSION

We have considered the parties' remaining arguments and find them unpersuasive. For the foregoing reasons, the Judgment of the U.S. Court of International Trade is

## **AFFIRMED**